## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| MILLENNIUM HEALTH, LLC, a California limited liability company, | ) ) ) | |
| Plaintiff, | ) ) | Civil No. _____ |
| v. | ) ) ) | |
| CHRISTOPHER ROBERTS, an Ohio individual, HEALTHTRACKRX, INC., a Texas corporation, and AMERICAN INSTITUTE OF TOXICOLOGY, INC. d/b/a AIT LABORATORIES, an Indiana corporation, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## MILLENNIUM HEALTH, LLC'S VERIFIED COMPLAINT
## FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff Millennium Health, LLC ("Millennium" or "Plaintiff"), for its Verified Complaint against Defendants Christopher Roberts ("Roberts"), HealthTrackRx, Inc. ("HealthTrackRx") and American Institute of Toxicology, Inc. d/b/a AIT Laboratories ("AIT", and collectively with Roberts and HealthTrackRx, "Defendants") alleges as follows:

## INTRODUCTION

1.      In brazen violation of a valid and reasonable contract, one of Millennium's most senior and highly compensated Directors, Defendant Roberts has joined Defendants HealthTrackRx and AIT, direct competitors of Millennium, in an even more high-profile role – Chief Executive Officer – that will inevitably require him to use, divulge and rely on Millennium's critical confidential and proprietary information and trade secrets.  HealthTrackRx and AIT are well aware of Roberts' contractual prohibition on competitive activity and are tortiously interfering with the contractual obligations Roberts owes Millennium.  HealthTrackRx and AIT have no doubt

induced Roberts' breach in order to obtain the knowledge he gained while working his way up the corporate ladder at Millennium to become one of only three Regional Directors.  Roberts' sales and managerial expertise on behalf of Millennium, his knowledge of Millennium's business plans and strategies, and the relationships he developed as a result of such expertise are critical to Millennium.  They are also critical to HealthTrackRx and AIT.  Indeed, HealthTrackRx and AIT will unfairly benefit from Roberts' use of Millennium's hard-earned confidential and proprietary information and trade secrets without having to do the work or make the investment themselves.  This is precisely what Roberts agreed *not* to do when he accepted his contract with Millennium, and it is precisely the sort of conduct that Ohio law prohibits.

2.      By joining HealthTrackRx and AIT as its Chief Executive Officer, Roberts will not only undoubtedly breach his reasonable non-compete obligations to Millennium, but he will also inevitably use Millennium's critical confidential information and trade secrets to directly benefit HealthTrackRx and AIT.  Defendants' concerted efforts to contravene Roberts' contractual obligations to Millennium will irreparably harm Millennium, diminish the value of Millennium's confidential and proprietary information and trade secrets, and unfairly undermine Millennium's competitive edge in the drug-testing services industry.  Defendants' unlawful activities must be immediately enjoined.

## PARTIES

3.      Millennium Health, LLC ("Millennium") is a California limited liability company ("LLC") organized under the laws of California with its principal place of business in San Diego, California.  Millennium was formerly known as Millennium Laboratories, Inc.  Millennium is registered and conducts business in Ohio.  Millennium is a single-member LLC, and New

Millennium Holdco, Inc. is the only member of Millennium. There are no other members of Millennium besides New Millennium Holdco, Inc. Millennium is a citizen of California.

4. Christopher Roberts ("Roberts"), upon information and belief, is a domiciled citizen of Ohio and, at all times relevant to this Complaint, has resided at 6490 Aberdeen Lane, Medina, Ohio 44256.

5. HealthTrackRx, Inc. ("HealthTrackRx") is a Texas corporation with its principal place of business in Denton, Texas. HealthTrackRx also conducts business in the Northern District of Ohio. HealthTrackRx is a citizen of Texas.

6. American Institute of Toxicology, Inc. d/b/a AIT Laboratories ("AIT") is an Indiana corporation with its principal place of business in Denton, Texas. AIT also conducts business in the Northern District of Ohio. AIT is a citizen of Indiana and Texas.

## JURISDICTION AND VENUE

7. Original jurisdiction over this matter exists pursuant to 28 U.S.C. § 1332(a)(1) because Plaintiff and Defendants are domiciled citizens of different States, and the amount in controversy well exceeds $75,000.00, exclusive of interest and costs, at the time of the filing of this Verified Complaint.

8. Original jurisdiction over this matter also exists pursuant 28 U.S.C. § 1331 because Millennium asserts a cause of action arising under federal law pursuant to the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836, *et seq*. Further, the Court has supplemental jurisdiction over Millennium's state law claims pursuant to 28 U.S.C. § 1367.

9. This Court has personal jurisdiction over Roberts because he resides in Ohio and over HealthTrackRx and AIT because they both conduct business in Ohio.

10.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims against Defendants occurred in the Northern District of Ohio.  Venue is also proper under 28 U.S.C. § 1391(b)(1) because all Defendants are residents of the Northern District of Ohio.

## GENERAL ALLEGATIONS

### I.     Millennium's Business.

11.     Millennium is an established leader in the clinical drug testing and pharmacogenetic testing industry.  Millennium is, by far, the largest specialty laboratory in the clinical toxicology space, and has been for several years.  Millennium operates a cutting-edge, full-service, complex clinical laboratory located in San Diego, California.  Treatment centers and physicians treating patients for chronic pain, pain management, and addiction refer most of the specimens that Millennium tests.  The drug testing is used by substance-use disorder and pain management providers to obtain objective information about patients' recent use of prescription medications and/or illicit drugs and helps monitor the effectiveness of treatment plans.

12.     Millennium uses best-in-class, compliance-focused solutions through its Urine Drug Testing (UDT) and Oral Fluid Drug Testing (OFT) services.  Millennium's leading technology and proprietary methodologies provide specific drug and metabolite identification, quantification of drug and metabolite concentrations, and metabolizer status identification.  Indeed, Millennium has developed proprietary methodologies that provide some of the fastest and most reliable urine and oral fluid test results in the nation.  Millennium also offers genetic testing services, including pharmacogenetic testing, that help clinicians make more informed medication choices for their patients.

13.     Millennium has a national presence, is licensed to do business in all 50 States, and its laboratory maintains Clinical Laboratory Improvement Amendments (CLIA) certification and College of American Pathologists (CAP) accreditation.  It processes hundreds of thousands of patient specimens each year which allows it to provide meaningful insights into emerging drug use trends.  Millennium's unsurpassed customer service and customizable test offerings are designed to meet the unique needs of the health care professionals with whom Millennium works.

14.     Millennium has risen to the forefront of the clinical drug and pharmacogenetic testing industry by providing superior client service, market-leading turnaround times, accurate testing results, ethically-based decision-making and business practices, and dedication to education and research to benefit patient care.

15.     Millennium has invested and continues to invest significant resources to develop information, methods and techniques (and databases to store such information) to identify entities that utilize, or have the potential to utilize, its drug and genetic testing services; maintain, develop and nurture business relationships (and associated goodwill) with those entities and individuals; learn clients' business and testing needs; and develop innovative solutions to meet clients' testing needs.

16.     The information, databases and methodologies Millennium has developed are valuable, confidential and proprietary to Millennium and are not readily available to Millennium's competitors or the public.  The information and goodwill developed have significant economic value to Millennium, and would be of significant economic value to its competitors.  Indeed, Millennium has been successful in satisfying its customers' medical laboratory needs since 2008.

17.     As a sales and service-driven business, Millennium's business success and competitive position in the industry depend, in part, on the strength of the relationships it develops

with its customers, in addition to the unique and proprietary methods and techniques it creates for its business model.  Millennium relies on a network of well-trained sales professionals to market its products and services to clients around the country, and relies on its Sales Directors to, among other things, oversee Millennium's entire sales function along with the Vice President of Sales. To protect and maintain the integrity of its confidential information and key client relationships, Millennium requires its sales professionals to execute protective covenant agreements.

## II.  Defendant Roberts' Role with Millennium.

18.  Millennium hired Roberts in October 2010 as a Sales Representative for the territory of Northern Ohio, and promoted him to Senior Sales Specialist for the territory of Northern Ohio in April 2011.

19.  Millennium devoted substantial resources training Roberts in diagnostic sales, Millennium's proprietary business technologies, know-how, products, services, payor strategies and information, Millennium's research and development efforts, new tests and product lines, competitor offerings and points of differentiation and competitive intelligence.  Roberts was responsible for building Millennium's business within his assigned territory by managing existing accounts and developing new accounts.  He became the face of Millennium for existing and potential clients in his territory.

20.  Millennium also devoted substantial resources to support Roberts' efforts to develop and maintain clients, and to develop goodwill with Millennium's clients on behalf of Millennium.  In the course of his employment, Millennium gave Roberts access to its confidential and proprietary information and trade secrets, including but not limited to, customer lists, customer contacts, profitability of individual client accounts, business methods, techniques, means of operation, strategies, research and development, and business relationships that Millennium

dedicated its time and resources toward developing and maintaining, including relationships with existing and potential customers, referral sources and vendors that Roberts was responsible for developing and maintaining on behalf of Millennium.  Roberts was provided access to confidential reports distributed only to Millennium's sales force which detailed information such as customer volume, profitability, payor mix and order history.

21.     Then, in January 2012, Millennium promoted Roberts to the role of Regional Manager for the Midwest Region.  In this role, Roberts was responsible for profitable revenue generation, region growth and ongoing account management in his assigned territory.  Among other things, he was tasked with meeting and exceeding regional volume growth objectives both through new accounts and by increasing business in existing accounts, managing the entire sales team in his region, delivering sales goals while understanding expense budgets, developing regional strategic plans and expansion plans, understanding regulatory and reimbursement considerations applicable to Millennium's products and services, developing and managing strong sustainable relationships with key customers in his region, and making regular customer visits with all members in his region.  In his role as Regional Manager, Millennium provided Roberts with even greater access to its confidential and proprietary information and trade secrets than he had as Sales Representative and Senior Sales Specialist.

22.     Then, in July 2016, Roberts was promoted to the role of Regional Director.  He served as one of only three Regional Directors for Millennium and had 37 employees under his command.  In this role, Roberts was afforded expanded access to Millennium's highly confidential and proprietary information and trade secrets, including access to a greater swath of customer lists, contacts, preferences, requirements, profitability and ordering history, and greater access to Millennium's methods of operation, methods of determining efficiencies and marketing strategies.

He had access to key customers, insider knowledge of key customer data and analytics, and access to Millennium's nationwide sales structure and nationwide marketing techniques.

23.     In his role as Regional Director, Roberts was expected to serve as a liaison between his entire sales team and the corporate and executive teams.  For instance, if Millennium issued a policy update, such policy would funnel from corporate to Roberts, and then Roberts would use his discretion to distribute the policy to those on his team with a need to know.  Roberts was also involved in the creation of policy and provided input from his sales perspective to Millennium officers and executives.  In short, Roberts was a valued thought partner in both the development and implementation of Millennium's company policies and strategies for success.

24.     He continued to interact with Millennium's key customers and was expected to serve as the liaison between sales and corporate in an effort to address specific customer concerns or complaints.  Roberts participated in business planning and forecasting meetings with his fellow Regional Directors and executives, where he learned Millennium's nationwide practices and the strategies of the other Regional Directors, and also participated on executive team calls on which large potential customer opportunities and acquisitions were discussed.  Roberts also provided regular updates to the VP of Sales and executive management on customer prospects, pipeline volume forecasts, issues and opportunities for his Central Region.  Roberts effectively served as Millennium's "eyes and ears" as Regional Director, and thus, he was charged with recommending and implementing modifications to territorial and regional alignment where appropriate.  And, from approximately June 2018 to November 2018, Millennium did not have a VP of Sales, and during that period Roberts and the other two Regional Directors served, for all practical purposes, as *de facto* VPs and rotated their participation in VP-level calls and meetings.

25.     Roberts also had access to employee performance data, and had intimate knowledge as to those employees who were outperforming their goals, those who were underperforming and those employees who needed more coaching and/or support.  Roberts provided mentoring to his sales team and helped them to achieve their professional development and career objectives while delivering on their sales expectations and goals.  Roberts interacted frequently with peers on the sales management team to strategize and develop ideas for new business opportunities and growth. He has deep knowledge of Millennium's employee acquisition forecasts, growth objectives and obstacles to filling particular positions.

26.     Additionally, as Regional Director, Roberts had access to and served as Millennium's point person for the development of strategic partnerships with other laboratories based on customer requests for broader offerings.  Roberts is intimately familiar with pending strategic relationships, Millennium's goals and forecasts with respect to those relationships, and the overall status of those projects.

27.     Millennium undertook reasonable efforts to maintain the secrecy of its confidential and proprietary information and trade secrets.  Millennium requires its sales force to execute protective covenant agreements to ensure its confidential information is not disclosed or used by anyone outside of Millennium.  Millennium also restricts access to its sales data to certain classes of employees.  For instance, Territory Managers and Account Managers are permitted access to only their own customers' data, and Regional Managers are permitted access only to sales data within their respective regions.  Additionally, access to Millennium's databases and computers are protected by logins and passwords, and employees are required to regularly change their passwords.

**III.    Roberts Signs Confidentiality, Non-Disclosure and Non-Competition Agreement.**

28.    As part of his employment, Roberts signed an Agreement Regarding Confidentiality, Non-Disclosure and Non-Competition (the "Agreement") on March 8, 2013.  In exchange for his agreement to the protective covenants, Millennium provided Roberts with a highly competitive salary and access to Millennium's confidential information including proprietary data regarding its customer base.

29.    Millennium and Roberts entered into the Agreement to protect Millennium's trade secret, proprietary and confidential information, and legitimate business interests.

30.    The Agreement, among other restrictions, contains non-compete, non-solicit, and confidentiality and non-disclosure restrictions.  A true and correct copy of the Agreement is attached hereto as Exhibit A.

31.    The confidentiality and non-disclosure provisions of the Agreement provide, in pertinent part:

2.    **Confidential Information:**

a.    Non-Disclosure. Employee shall keep in strictest confidence and trust all Confidential Information, and Employee shall not directly or indirectly reveal, report, publish, transfer, disclose, use, access, or sell any Confidential Information, either during Employee's employment or thereafter, or assist in any of the aforementioned actions, except as may be necessary in the ordinary course of properly performing Employee's duties for Company. Employee understands and agrees that the restrictions on use or disclosure of Confidential Information will only apply for two (2) years after the end of Employee's employment where information that does not qualify as a trade secret (as defined by applicable law) is concerned; however, the restrictions will continue to apply to trade secret information for as long as the information at issue remains qualified as a trade secret. Nothing herein shall be construed to require withholding information in violation of any applicable state or federal law, or to prohibit the reporting of information where such is protected by law.

b.    Unfair Competition. Employee acknowledges that the unauthorized revelation, reporting, publishing, transfer, sale, use, access, or

10

disclosure of Confidential Information is unfair competition. Employee agrees not to engage at any time in unfair competition with Company.

32.   The Agreement defines Confidential Information, in pertinent part, as:

D.   **WHEREAS**, Company agrees to disclose to Employee Company Confidential Information to which Employee did not previously have access. As used herein, "Confidential Information" refers to an item of information or compilation of information, in any form (tangible or intangible), related to the Company's business that Company has not made public or authorized public disclosure of, and that is not generally known to the public through proper means. Confidential Information includes, but is not limited to, non-public information about: unique technical and non-technical information developed or used in connection with the business of Company; information concerning the concepts and ideas behind the current, future and proposed products and processes of Company, including, but not limited to, research, design details and specifications, inventions, formulae, diagrams, software, flow charts, unique data, and methods of doing business; and marketing, customer, vendor, financial, and employee information related to Company including, but not limited to, marketing techniques and materials, competitive intelligence, product or service development plans, business forecasts, price lists, profit information, margin information, bank account records, financial statements, ledgers, deposits, receipts, product information, inventory, customer lists, names and addresses of customers, and any information and records concerning customers or other third parties which are unique to Company; and trade secrets….

33.   Millennium agreed and did in fact disclose Confidential Information (as defined in the Agreement) to Roberts to which he did not previously have access.  Information provided to Roberts under the terms of the Agreement included current and prospective customer information, sales data, marketing techniques and materials, competitive intelligence, product and service development plans, price lists, and other non-public information that is not generally known in the industry.  Millennium took reasonable efforts to maintain the secrecy of this information, Millennium developed the Confidential Information at significant cost, and the Confidential Information provides Millennium with an advantage over competing laboratories who lack such information.

34.     As it pertains to Roberts' post-employment non-competition obligations, the Agreement states:

### 3.     Protective Covenants:

Employee recognizes that as part of his or her employment with Company Employee has or will receive and have access to one or more of the following: (a) materials and information regarding Company's technologies, know-how, products, services and sales that are proprietary and confidential to Company, including but not limited to Confidential Information; (b) business relationships that the Company has dedicated its time and resources towards developing and maintaining, including relationships with existing and potential customers, clients, referral sources and vendors and/or relationships that it is paying Employee to develop and/or maintain for the Company, and/or (c) training regarding the business methods, techniques, strategies and/or means of operation, each of which gives the Company a competitive advantage and which Employee could use to gain unfair competitive advantage against the Company if his or her activities following employment are not restricted. Though Company has made its best efforts to create restrictions as narrow as possible, Employee understands and agrees that one of the purposes of this Agreement is to protect the benefits described above. Under any and all circumstances, Employee's use of Company's Confidential Information to compete against Company is prohibited by this Agreement, and Employee agrees with that prohibition. In addition, Employee agrees to the following limitations and restrictions:
…
        b.     <u>After Termination of Employment Relationship</u>. To protect the legitimate interests of Company in, among other things, protecting its Confidential Information, employment relationships, relationships with Company customers and goodwill, and in consideration for, among other things as provided in this Agreement, Company's promise to give Employee certain Confidential Information, some of which constitutes trade secrets of Company, which Employee did not previously have and to enforce Employee's promise not to disclose such Confidential Information, Employee hereby agrees to be legally bound to the following restrictive covenants, which Employee acknowledges and agrees are reasonably necessary and narrowly tailored to protect Company's legitimate business interests:
…
        (ii)     <u>Non-Competition</u>:

        For a period of one year following Employee's termination of employment with Employer, regardless of which party terminates the employment relationship or the reasons for such termination, Employee

12

shall not, directly or indirectly, provide services that are the same or similar in function or purpose to the services Employee provides to the Employer during the last two years of employment (whether as an owner, shareholder, officer, director, manager, supervisor, employee or agent) to any business that is competitive with any aspect of Employer's business as to which Employee had material-business related involvement or about which Employee received Confidential Information during the last two years of employment in any state, province, or other jurisdiction in which Employee performed services or otherwise assisted the Employer in doing business or preparing to do business during the last two years of employment (the "Restricted Area"). A business shall be considered "competitive" if its products or services would compete with or displace the products and/or services that the Company was engaged in providing or developing at the time Employee's employment with the Company ended. Employee specifically acknowledges and agrees that the foregoing restriction on competition with Employer will not prevent Employee from obtaining gainful employment following the termination of his employment with Employer and is a reasonable restriction to protect the Company's legitimate business interests….

35.     Roberts also acknowledged and agreed that the covenants and restrictions contained in the Agreement were reasonable and valid and necessary for the protection of Millennium's legitimate business interests.

36.     Roberts also acknowledged and agreed that monetary damages at law will be an insufficient remedy in view of the irreparable harm which will be suffered by Millennium if he should breach or violate, or threaten to breach or violate, any of the terms of the Agreement.  (*See* Exhibit A, at ¶ 6.)

37.     The Agreement remains in full force and effect.

## IV.     Roberts' Compensation History.

38.     In addition to Millennium providing Roberts with extensive training and support and access to Millennium's confidential and proprietary information and trade secrets, Millennium afforded Roberts highly competitive salaries over the course of his employment.

39.     As Regional Director, Roberts has been eligible for and has received target bonuses based on his Actual Qualified Drug Testing Volume, bonuses based on Millennium's Quarterly EBITDA, as well as highly competitive commissions.

40.     In the last six years, Roberts has earned over $2.8 million in compensation from Millennium, and over $1 million in compensation since he commenced his role as Regional Director only a few years ago.

**V.     Roberts Announces He Intends to Join Direct Competitor HealthTrackRx/AIT.**

41.     On or about October 4, 2019, Roberts submitted his resignation to Millennium by letter and announced his intent to join HealthTrackRx/AIT Laboratories as its Chief Executive Officer.  (*See* Exhibit B attached hereto.)

42.     In his resignation letter, Roberts acknowledges, among other things, that Millennium had hired him to help grow its revenue over the years.  He also acknowledges his role as Chief Executive Officer of HealthTrackRx/AIT will include strategic planning and management, which are the same or substantially similar responsibilities (among others) he provided to Millennium.  (Exhibit B.)

43.     Roberts also stated in his letter that he advised HealthTrackRx/AIT of the restrictions in his Agreement with Millennium, and that he "intend[s] to avoid violating the agreement."

44.     Yet at the same time, knowing full-well he was going to work for a competitor, and knowing that his joining HealthTrackRx/AIT as its Chief Executive Officer would violate the terms of his Agreement with Millennium, Roberts requested that Millennium release him from his post-employment non-compete and non-solicitation obligations.  (*See* Exhibit B and Exhibit C attached hereto.)

45.     Indeed, while Roberts was communicating with Millennium and assuring Millennium he would not compete in violation of the Agreement, and in violation of the forum-selection clause in his Agreement, on October 4, 2019 Roberts filed a complaint in Texas seeking to have the non-compete and non-solicitation provisions in his Agreement declared unenforceable and invalid.  (*See* Exhibit D attached hereto.)

46.     On or about October 4, 2019, unaware of Roberts' Texas lawsuit, Millennium responded to Roberts' resignation letter by accepting his resignation effective October 18, 2019. Millennium also denied Roberts' request to be released from his post-employment obligations under the Agreement, and advised Roberts that HealthTrackRx/AIT is a direct competitor of Millennium, but indicated it was further investigating his actions.  Millennium also requested Roberts take all steps to preserve any and all communications and materials in his possession, custody or control that refer or relate in any manner to his new employer, HealthTrackRx/AIT.

47. Upon information and belief, for months prior to Roberts' October 4, 2019 resignation and while he was still being handsomely compensated by Millennium, Roberts was plotting his departure and negotiating with HealthTrackRx/AIT regarding his new CEO position so he could hit the ground running immediately after his resignation.

48.     On October 7, 2019, Millennium sent HealthTrackRx/AIT a letter reminding HealthTrackRx/AIT of Roberts' post-employment contractual obligations to Millennium, including but not limited to, his non-competition and confidentiality and non-disclosure obligations pursuant to his Agreement.

49.     Upon information and belief, even prior to Millennium sending its letter to HealthTrackRx/AIT, HealthTrackRx/AIT was aware of Roberts' Agreement with Millennium due to Roberts disclosing it to HealthTrackRx/AIT.  As such, HealthTrackRx/AIT is aware of Roberts'

post-employment non-compete and confidentiality and non-disclosure obligations under the Agreement.

50.     HealthTrackRx/AIT is a direct competitor of Millennium.  HealthTrackRX/AIT is a CLIA-certified and CAP-accredited clinical prescription drug monitoring laboratory that offers drug testing, with an emphasis on substance abuse disorders.  Millennium and HealthTrackRx/AIT compete for the same customers.

51.     HealthTrackRx/AIT is a competing business under the Agreement's definition of competing business.  Under the Agreement, a business shall be considered "competitive" if its "products or services would compete with or displace the products and/or services that [Millennium] was engaged in providing or developing at the time [Roberts'] employment with [Millennium] ended."  HealthTrackRx/AIT provides its clients with drug testing (with an emphasis on substance abuse disorders), as does Millennium.

52.     On or around October 9, 2019, Roberts announced via LinkedIn that he has joined HealthTrackRx/AIT as its Chief Executive Officer, although his profile still lists Medina, Ohio as his residence.  (See Exhibit E attached hereto.)

53.     Upon information and belief, his duties and responsibilities will include those that are the same or similar in function or purpose to the services Roberts provided to Millennium, including overseeing its sales force and customer relationships, business planning and forecasting, and developing and implementing business and marketing strategies.

54.     Upon information and belief, as Chief Executive Officer, Roberts' ultimate responsibility will be to generate revenue for HealthTrackRx/AIT.  Based on the information and knowledge he gained solely through his employment with Millennium, Roberts is armed to

immediately maximize HealthTrackRx/AIT's profitability through sales and customer acquisition in the drug testing industry.

55.     Roberts will also increase HealthTrackRx/AIT's revenue and growth by disclosing and using Millennium's tested business model and strategies that he learned solely through his employment with Millennium.  Roberts is intimately familiar with Millennium's long-term sales, business and marketing strategies, and also intimately aware of its strategic partnership planning in an effort to expand the services Millennium provides its customers.

56.     As Chief Executive Officer, Roberts will be "running" HealthTrackRx/AIT with intimate knowledge of the industry leader – Millennium's – trade secret, proprietary and confidential information.

57.     Upon information and belief, HealthTrackRx/AIT hired Roberts as its Chief Executive Officer in order to benefit from his knowledge of Millennium's trade secret, proprietary and confidential information.

58.     Upon information and belief, HealthTrackRx/AIT hired Roberts as its Chief Executive Officer to disguise their intent to take advantage of his knowledge of Millennium's long-term sales, business and marketing strategies.

59.     In reality, Roberts is not qualified to be Chief Executive Officer, as he has a B.A. in marketing and his sole professional experience is in sales.

60.     Upon information and belief, HealthTrackRx/AIT's purpose of hiring Roberts solely for his knowledge of Millennium's long-term sales, business and marketing strategies is made evident by a LinkedIn post by a "private equity advisor" – Jason Bristol – who himself is a former Millennium employee and indeed, used to supervise Roberts at Millennium until late 2015. The LinkedIn post emphasized HealthTrackRx/AIT is "[l]ooking for 32 reps across USA 300k at

plan.  **New CEO who is focused on sales sales sales**." (*See* <u>Exhibit F</u>, attached hereto) (emphasis added).  In just the last thirty (30) days, HealthTrackRx/AIT has hired two other former Millennium sales representatives, and the threat that Defendants will poach additional Millennium employees is very real.

61.     Further, upon information and belief, HealthTrackRx/AIT will use Roberts to solicit Millennium's sales representatives, in violation of his contractual non-solicitation obligations, which prohibit him from directly or indirectly soliciting Millennium employees to terminate their employment with Millennium.

**<u>COUNT I</u>**

**Breach of Contract – Non-Competition**
**(Injunctive Relief and Damages)**
**Against Roberts**

62.     Millennium realleges and incorporates by reference Paragraphs 1 through 61 as though fully set forth herein.

63.     The Agreement is a valid and enforceable contract.

64.     Among other obligations under the Agreement, Roberts agreed and was obligated, during the period of his employ and for a period of one year following Roberts' termination of employment, regardless of which party terminates the employment relationship or the reasons of such termination, not to provide services that are the same or similar in function or purpose to the services he provided Millennium during the last two years of his employment to any business that is competitive with any aspect of Millennium's business as to which Roberts had material-business related involvement or about which Roberts received Confidential Information (as defined in the Agreement) during the last two years of his employment.

65.     The Agreement further provides that a business shall be considered "competitive" if its products or services would compete with or displace the products and/or services that Millennium was engaged in providing or developing at the time Roberts' employment with Millennium ended.

66.     The terms of the Agreement are not greater than is required for the protection of Millennium's legitimate business interests, including its confidential information and goodwill with customers.

67.     The terms of the Agreement do not pose an undue hardship on Roberts.

68.     The Agreement is not injurious to the public.

69.     Millennium's business includes drug testing.  HealthTrackRx/AIT's products or services compete with Millennium's services because HealthTrackRx/AIT provides drug testing services, with an emphasis on substance abuse disorders just like Millennium.   Indeed, HealthTrackRx/AIT primarily promotes its toxicology testing services, and it would be unfeasible to carve out and area of its business that would allow Roberts to work there without violating his non-competition covenant.

70.     The non-competition covenant reasonably protects Millennium's legitimate business interests, including its confidential information and goodwill among customers.

71.     Millennium has fully performed its contractual obligations with Roberts under the Agreement.

72.     Roberts has violated the Agreement by engaging in the exact action from which he agreed to refrain, namely, providing services to a competing business.

73.     HealthTrackRx/AIT is a direct competitor of Millennium.  As Regional Director for Millennium, Roberts served as a liaison between his entire 37-person sales team and the

corporate and executive teams.  He continued to interact with Millennium's key customers and served as the liaison between sales and corporate in an effort to address specific customer concerns or complaints.  Roberts participated in business planning and forecasting meetings with his fellow Regional Directors and executives, where he learned Millennium's nationwide practices and the strategies of the other Regional Directors, and also participated on executive team calls on which large potential customer opportunities and acquisitions were discussed.

74.     Roberts also had access to employee performance data, and had intimate knowledge as to those employees who were outperforming their goals, those who were underperforming and those employees who needed more coaching and/or support.  He has knowledge of Millennium's employee acquisition forecasts, growth objectives and obstacles to filling particular positions.

75.     Additionally, as Regional Director, Roberts had access to and served as Millennium's point person for the development of strategic partnerships with other laboratories based on customer requests for broader offerings.  Roberts is intimately familiar with pending strategic relationships, Millennium's goals and forecasts with respect to those relationships, and the overall status of those projects.

76.     Upon information and belief, given his high-level role at HealthTrackRx/AIT – Chief Executive Officer – Roberts will be responsible for generating revenue, including maximizing HealthTrackRx/AIT's opportunities and strategies to sell its products and services to the very same customers as Millennium.  Roberts will necessarily use, disclose, and rely on Millennium's confidential information in the course of his duties for HealthTrackRx/AIT and to compete with Millennium.

77. Millennium has suffered and will continue to suffer damages as a result of Roberts' breach of contract, including diminished value of its confidential information, goodwill with customers, and loss of its competitive advantage.

78. Millennium's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

79. Roberts' actions will continue to cause harm to Millennium if not restrained.

80. Millennium has demonstrated that Roberts, unless restrained, will engage in conduct that breaches the Agreement. Millennium is likely to prevail on the merits of this cause of action.

81. Should this court grant injunctive relief to Millennium, the burden on Roberts would be slight compared to the injury to Millennium if it is not granted. No injury to Roberts would result from an order requiring him to comport his actions under the Agreement. Roberts furthermore agreed injunctive relief would be an appropriate remedy in the event he breached the Agreement.

82. The grant of an injunction will not disserve the public interest. Indeed, injunctive relief is consistent with the Agreement between the parties.

**WHEREFORE**, Millennium prays for judgment against Roberts and requests the Court grant the following relief:

A. Entry of a Temporary Restraining Order against Roberts and HealthTrackRx/AIT, consistent with the relief as requested in Plaintiff's Motion for a Temporary Restraining Order and Memorandum in Support;

B. Entry of a Preliminary Injunction, and, upon final disposition, entry of a Permanent Injunction against Roberts, enjoining him consistent with the terms of the Agreement,

and any other applicable relief as set forth in Plaintiff's Motion for a Temporary Restraining Order and Memorandum in Support;

C.  Entry of a declaratory judgment in favor of Millennium, and against Roberts, finding that the conduct complained of is illegal and unfair and violates the Agreement between the parties;

D.  For actual, compensatory and exemplary damages to be determined at trial; and

E.  Such other and further relief the Court deems as just.

### COUNT II

**Breach of Contract – Disclosure of Confidential Information**
**(Injunctive Relief and Damages)**
**Against Roberts**

83.     Millennium realleges and incorporates by reference Paragraphs 1 through 82 as though fully set forth herein.

84.     The Agreement is a valid and enforceable contract.

85.     Among other obligations under the Agreement, Roberts agreed and was obligated at all times, both during his employment and after termination of such employment, to keep in the strictest confidence and trust all Confidential Information and not directly or indirectly reveal, publish, transfer, disclose, use, access or sell any Confidential Information or assist in any of the aforementioned actions.

86.     Pursuant to the Agreement, "Confidential Information" refers to an item of information or compilation of information, in any form (tangible or intangible), related to the Millennium's business that Millennium has not made public or authorized public disclosure of, and that is not generally known to the public through proper means. Confidential Information includes, but is not limited to, non-public information about: unique technical and non-technical

information developed or used in connection with the business of Millennium; information concerning the concepts and ideas behind the current, future and proposed products and processes of Millennium, including, but not limited to, research, design details and specifications, inventions, formulae, diagrams, software, flow charts, unique data, and methods of doing business; and marketing, customer, vendor, financial, and employee information related to Company including, but not limited to, marketing techniques and materials, competitive intelligence, product or service development plans, business forecasts, price lists, profit information, margin information, bank account records, financial statements, ledgers, deposits, receipts, product information, inventory, customer lists, names and addresses of customers, and any information and records concerning customers or other third parties which are unique to Company; and trade secrets.

87.    The confidentiality and non-disclosure covenant reasonably protects Millennium's legitimate business interests, including its confidential information.

88.    The terms of the Agreement are not greater than is required for the protection of Millennium's legitimate business interests, including its confidential information.

89.    The terms of the Agreement do not pose an undue hardship on Roberts.

90.    The Agreement is not injurious to the public.

91.    Millennium has fully performed its contractual obligations with Roberts under the Agreement.

92.    Roberts has violated the Agreement by engaging in the exact action from which he agreed to refrain, namely, engaging in a competing business purpose that will inevitably result in his disclosure and use of Millennium's confidential information.

93.    HealthTrackRx/AIT is a direct competitor of Millennium.  As Regional Director for Millennium, Roberts served as a liaison between his entire sales team and the corporate and

executive teams.  He continued to interact with Millennium's key customers and served as the liaison between sales and corporate in an effort to address specific customer concerns or complaints.  Roberts participated in business planning and forecasting meetings with his fellow Regional Directors and executives, where he learned Millennium's nationwide practices and the strategies of the other Regional Directors, and also participated on executive team calls on which large potential customer opportunities and acquisitions were discussed.

94.     Roberts also had access to employee performance data, and had intimate knowledge as to those employees who were outperforming their goals, those who were underperforming and those employees who needed more coaching and/or support.  He has knowledge of Millennium's employee acquisition forecasts, growth objectives and obstacles to filling particular positions.

95.     Additionally, as Regional Director, Roberts had access to and served as Millennium's point person for the development of strategic partnerships with other laboratories based on customer requests for broader offerings.  Roberts is intimately familiar with pending strategic relationships, Millennium's goals and forecasts with respect to those relationships, and the overall status of those projects.

96.     Upon information and belief, given his high-level role at HealthTrackRx/AIT – Chief Executive Officer – Roberts will be responsible for generating revenue, including maximizing HealthTrackRx/AIT's opportunities and strategies to sell its products and services to the very same customers as Millennium.  Roberts will necessarily use, disclose, and rely on Millennium's confidential information in the course of his duties for HealthTrackRx/AIT and to compete with Millennium.

97. Millennium has suffered and will continue to suffer damages as a result of Roberts' breach of contract, including loss of business and diminished value of its confidential information, goodwill with customers, and loss of its competitive advantage.

98. Millennium's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

99. Roberts' actions will continue to cause harm to Millennium if not restrained.

100. Millennium has demonstrated that Roberts, unless restrained, will engage in conduct that breaches the Agreement. Millennium is likely to prevail on the merits of this cause of action.

101. Should this court grant injunctive relief to Millennium, the burden on Roberts would be slight compared to the injury to Millennium if it is not granted. No injury to Roberts would result from an order requiring him to comport his actions under the Agreement. Roberts furthermore agreed injunctive relief would be an appropriate remedy in the event he breached the Agreement.

102. The grant of an injunction will not disserve the public interest. Indeed, injunctive relief is consistent with the Agreement between the parties.

**WHEREFORE**, Millennium prays for judgment against Roberts and requests the Court grant the following relief:

A. Entry of a Temporary Restraining Order against Roberts and HealthTrackRx/AIT, consistent with the relief as requested in Plaintiff's Motion for a Temporary Restraining Order and Memorandum in Support;

B. Entry of a Preliminary Injunction, and, upon final disposition, entry of a Permanent Injunction against Roberts, enjoining him consistent with the terms of the Agreement,

and any other applicable relief as set forth in Plaintiff's Motion for a Temporary Restraining Order and Memorandum in Support;

C.  Entry of a declaratory judgment in favor of Millennium, and against Roberts, finding that the conduct complained of is illegal and unfair and violates the Agreement between the parties;

D.  For actual, compensatory and exemplary damages to be determined at trial; and

E.  Such other and further relief the Court deems as just.

## COUNT III

**Trade Secrets Misappropriation –
Ohio Uniform Trade Secrets Act, Ohio Rev. Code §§ 1333.61, *et seq.*
(Injunctive Relief and Damages)
Against All Defendants**

103.    Millennium realleges and incorporates by reference Paragraphs 1 through 102 as though fully set forth herein.

104.    The Ohio Uniform Trade Secrets Act, Ohio Rev. Code §§ 1333.61, *et seq.*, prohibits the actual and threatened misappropriation of trade secrets.  Under the Act, a trade secret means "information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following: (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use;" and "(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Ohio Rev. Code § 1333.61(D).

105.    Under the Act, misappropriation means any of the following: "(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; (2) Disclosure or use of a trade secret of another without the express or implied consent of the other person by a person who did any of the following: (a) Used improper means to acquire knowledge of the trade secret; (b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; (c) Before a material change of their position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake." Ohio Rev. Code § 1333.61(C).

106.    Throughout his employment with Millennium, Roberts possessed and had knowledge of certain confidential and proprietary information of Millennium that constitutes trade secrets under the Ohio Uniform Trade Secrets Act, including, but not limited to customer lists, customer contacts, profitability of individual client accounts, business methods, techniques, means of operation, strategies, research and development, business relationships that Millennium dedicated its time and resources toward developing and maintaining, including relationships with existing and potential customers, referral sources and vendors that Roberts was responsible for developing and maintaining on behalf of Millennium, customers' ordering history, Millennium's methods of operation, methods of determining efficiencies and marketing strategies. Roberts also had access to key customers, insider knowledge of key customer data and analytics, and access to Millennium's nationwide sales structure and nationwide marketing techniques. Roberts was

further provided access to confidential reports distributed only to Millennium's sales force which detailed information such as customer volume, profitability, payor mix and order history.

107.    Millennium derives economic benefit from the fact that its trade secrets, including its proprietary business technologies, know-how, products, services, payor strategies and information, research and development efforts, new tests and product lines, customer lists, customer contacts, profitability of individual client accounts, means of operation, strategies, and business relationships, which are not generally known to individuals or entities outside of Millennium.

108.    Millennium takes reasonable measures to protect its trade secrets.  These measures include password-protected databases, confidentiality and non-disclosure agreements, and limitations on dissemination of information on a need-to-know basis.

109.    Roberts knew he had a duty to maintain the secrecy of Millennium's trade secrets due to his acknowledgement of such under the Agreement and in his role as Regional Director.

110.    HealthTrackRx/AIT is under a duty to not accept any misappropriated trade secrets, including Millennium's trade secrets, and HealthTrackRx/AIT is also under a duty not to disclose or utilize misappropriated trade secrets for the purpose of gaining a competitive advantage in the industry.

111.    HealthTrackRx/AIT is a direct competitor of Millennium.  As Regional Director for Millennium, Roberts served as a liaison between his entire sales team and the corporate and executive teams.  He continued to interact with Millennium's key customers and served as the liaison between sales and corporate in an effort to address specific customer concerns or complaints.  Roberts participated in business planning and forecasting meetings with his fellow Regional Directors and executives, where he learned Millennium's nationwide practices and the

strategies of the other Regional Directors, and also participated on executive team calls on which large potential customer opportunities and acquisitions were discussed.

112.    Roberts also had access to employee performance data, and had intimate knowledge as to those employees who were outperforming their goals, those who were underperforming and those employees who needed more coaching and/or support.  He has knowledge of Millennium's employee acquisition forecasts, growth objectives and obstacles to filling particular positions.

113.    Additionally, as Regional Director, Roberts had access to and served as Millennium's point person for the development of strategic partnerships with other laboratories based on customer requests for broader offerings.  Roberts is intimately familiar with pending strategic relationships, Millennium's goals and forecasts with respect to those relationships, and the overall status of those projects.

114.    Upon information and belief, given his high-level role at HealthTrackRx/AIT – Chief Executive Officer – Roberts will be responsible for generating revenue, including maximizing HealthTrackRx/AIT's opportunities and strategies to sell its products and services to the very same customers as Millennium.  There is a very real threat and substantial probability that Roberts will necessarily use, disclose, and rely on Millennium's trade secrets in the course of his duties for HealthTrackRx/AIT and to compete with Millennium.   Roberts cannot do his job as a Chief Executive Officer without using, referencing and disclosing Millennium's trade secrets.

115.    Upon information and belief, HealthTrackRx/AIT has not taken any actions to prevent Roberts from using or disclosing Millennium's trade secrets and any such actions would be ineffectual.

116.    Upon information and belief, HealthTrackRx/AIT hired Roberts as its Chief Executive Officer in order to benefit from his knowledge of Millennium's trade secret, proprietary

and confidential information, including his knowledge of Millennium's long-term sales, business and marketing strategies.

117.    In light of the similarities between Roberts' roles at Millennium and HealthTrackRx/AIT, and the fact that the companies are direct competitors, Roberts will inevitably disclose or continue to disclose and utilize Millennium's trade secrets in the course of his employment with HealthTrackRx/AIT in his role as Chief Executive Officer for HealthTrackRx/AIT.  Given Robert's extensive and longstanding knowledge of Millennium's trade secrets and confidential business information, it will be impossible for him to compartmentalize and selectively suppress such information while working for Millennium's direct competitor, no matter how well-intentioned his efforts may be to do so.

118.    Given the substantial similarities and the competitive nature of the businesses, as well as Roberts' high-level roles at both Millennium and HealthTrackRx/AIT, Defendants have threatened to improperly acquire, disclose, and use Millennium's trade secrets without consent of any kind for their own financial gain.

119.    Defendants' actions constitute threatened misappropriation in violation of the Ohio Uniform Trade Secrets Act, and thus may be enjoined by injunctive relief. *See* Ohio Rev. Code § 1333.62(A) ("Actual *or threatened* misappropriation may be enjoined.").

120.    Millennium has suffered and will continue to suffer damages and irreparable harm as a result of Defendants' breach of the Ohio Uniform Trade Secrets Act, including loss of, customers, harm to its goodwill and reputation, and an unfair reduction in its competitive advantage.

121.    Millennium is entitled to actual damages from Defendants, jointly and severally, and for attorneys' fees.

Case: 1:19-cv-02381-DCN  Doc #: 1  Filed:  10/14/19  31 of 44.  PageID #: 31

122.    Millennium's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

123.    Defendants' actions will continue to cause irreparable harm and damages to Millennium and its trade secret information if not restrained.

**WHEREFORE**, Millennium prays for judgment against Defendants, jointly and severally, and requests the Court grant the following relief:

A. Entry of a Temporary Restraining Order against Roberts and HealthTrackRx/AIT, consistent with the relief as requested in Plaintiff's Motion for a Temporary Restraining Order and Memorandum in Support;

B. Entry of a Preliminary Injunction, and, upon final disposition, entry of a Permanent Injunction against Roberts and HealthTrackRx/AIT, enjoining them from using, referencing or disclosing Millennium's trade secrets under the Ohio Uniform Trade Secrets Act, and any other applicable relief as set forth in Plaintiff's Motion for a Temporary Restraining Order and Memorandum in Support;

C. Entry of a Preliminary Injunction, and, upon final disposition, entry of a Permanent Injunction against Roberts and HealthTrackRx/AIT, enjoining Roberts from working for HealthTrackRx/AIT in any leadership capacity, including Chief Executive Officer, due to the fact that he will necessarily use, reference, and disclose Millennium's trade secrets;

D. For actual, compensatory and exemplary damages to be determined at trial;

E. For attorneys' fees in accordance with the Ohio Uniform Trade Secrets Act; and

F. Such other and further relief the court deems as just.

<u>COUNT IV</u>
**Trade Secrets Misappropriation –**
**Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq*.**
**(Injunctive Relief and Damages)**
**Against All Defendants**

124.    Millennium realleges and incorporates by reference Paragraphs 1 through 123 as though fully set forth herein.

125.    The Defend Trade Secrets Act ("DTSA") of 2016, Pub. L. No. 114-153, 130 Stat. 376, which was passed into law on May 11, 2016 and amends chapter 90 of Title 18 of the U.S. Code, forbids the actual and threatened misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

126.    Under the DTSA, "trade secret" means "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if, (A) the owner thereof has taken reasonable measures to keep such information secret, and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

127.    Under the DTSA, "misappropriation" means "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii)

32

at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was: (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that (I) the trade secret was a trade secret and (II) knowledge of the trade secret had been acquired by accident or mistake." 18 U.S.C. § 1839(5).

128.    Under    the    DTSA,    "improper    means"    "(A)    includes    theft,    bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6).

129.    Throughout his employment with Millennium, Roberts possessed and had knowledge of certain confidential and proprietary information of Millennium that constitutes trade secrets under the Defend Trade Secrets Act, including, but not limited to customer lists, customer contacts, profitability of individual client accounts, business methods, techniques, means of operation, strategies, research and development, business relationships that Millennium dedicated its time and resources toward developing and maintaining, including relationships with existing and potential customers, referral sources and vendors that Roberts was responsible for developing and maintaining on behalf of Millennium, customers' ordering history, Millennium's methods of operation, methods of determining efficiencies and marketing strategies.  Roberts also had access to key customers, insider knowledge of key customer data and analytics, and access to Millennium's nationwide sales structure and nationwide marketing techniques.  Roberts was

further provided access to confidential reports distributed only to Millennium's sales force which detailed information such as customer volume, profitability, payor mix and order history.

130.    Millennium derives economic benefit from the fact that its trade secrets, including its proprietary business technologies, know-how, products, services, payor strategies and information, research and development efforts, new tests and product lines, customer lists, customer contacts, profitability of individual client accounts, means of operation, strategies, and business relationships, which are not generally known to individuals or entities outside of Millennium.

131.    Millennium takes reasonable measures to protect its trade secrets.  These measures include password-protected databases, confidentiality and non-disclosure agreements, and limitations on dissemination of information on a need-to-know basis.

132.    Roberts knew he had a duty to maintain the secrecy of Millennium's trade secrets due to his acknowledgement of such under the Agreement and in his role as Regional Director.

133.    HealthTrackRx/AIT is under a duty to not accept any misappropriated trade secrets, including Millennium's trade secrets, and HealthTrackRx/AIT is also under a duty not to disclose or utilize misappropriated trade secrets for the purpose of gaining a competitive advantage in the industry.

134.    HealthTrackRx/AIT is a direct competitor of Millennium.  As Regional Director for Millennium, Roberts served as a liaison between his entire sales team and the corporate and executive teams.  He continued to interact with Millennium's key customers and served as the liaison between sales and corporate in an effort to address specific customer concerns or complaints.  Roberts participated in business planning and forecasting meetings with his fellow Regional Directors and executives, where he learned Millennium's nationwide practices and the

strategies of the other Regional Directors, and also participated on executive team calls on which large potential customer opportunities and acquisitions were discussed.

135.    Roberts also had access to employee performance data, and had intimate knowledge as to those employees who were outperforming their goals, those who were underperforming and those employees who needed more coaching and/or support.  He has knowledge of Millennium's employee acquisition forecasts, growth objectives and obstacles to filling particular positions.

136.    Additionally, as Regional Director, Roberts had access to and served as Millennium's point person for the development of strategic partnerships with other laboratories based on customer requests for broader offerings.  Roberts is intimately familiar with pending strategic relationships, Millennium's goals and forecasts with respect to those relationships, and the overall status of those projects.

137.    Upon information and belief, given his high-level role at HealthTrackRx/AIT – Chief Executive Officer – Roberts will be responsible for generating revenue, including maximizing HealthTrackRx/AIT's opportunities and strategies to sell its products and services to the very same customers as Millennium.  There is a very real threat and substantial probability that Roberts will necessarily use, disclose, and rely on Millennium's trade secrets in the course of his duties for HealthTrackRx/AIT and to compete with Millennium.

138.    Upon information and belief, HealthTrackRx/AIT has not taken any actions to prevent Roberts from using or disclosing Millennium's trade secrets and any such actions would be ineffectual.

139.    Upon information and belief, HealthTrackRx/AIT hired Roberts as its Chief Executive Officer in order to benefit from his knowledge of Millennium's trade secret, proprietary

and confidential information, including his knowledge of Millennium's long-term sales, business and marketing strategies.

140.    In light of the similarities between Roberts' roles at Millennium and HealthTrackRx/AIT, and the fact that the companies are direct competitors, there is a substantial threat that Roberts' will disclose and use Millennium's trade secrets in the course of his employment with HealthTrackRx/AIT in his role as Chief Executive Officer.  Given Robert's extensive and longstanding knowledge of Millennium's trade secrets and confidential business information, it will be impossible for him to compartmentalize and selectively suppress such information while working for Millennium's direct competitor, no matter how well-intentioned his efforts may be to do so.

141.    Given the similarities and the competitive nature of the businesses, as well as Roberts' high-level roles at both Millennium and HealthTrackRx/AIT, Defendants have threatened to improperly acquire, disclose, and use Millennium's trade secrets without consent of any kind for their own financial gain.

142.    Defendants' actions constitute threatened misappropriation in violation of the Defend Trade Secrets Act, and thus may be enjoined by injunctive relief. *See* 18 U.S.C. § 1836(b)(3)(A)(i) (empowering courts to grant injunctive relief "to prevent any actual *or threatened* misappropriation . . . .").

143.    Millennium has suffered and will continue to suffer damages and irreparable as a result of Defendants' breach of the Defend Trade Secrets Act, including loss of customers, harm to its goodwill and reputation, and an unfair reduction in its competitive advantage.

144.    Millennium is entitled to actual damages from Defendants, jointly and severally, and for attorneys' fees.

145.    Millennium's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

146.    Defendants' actions will continue to cause irreparable harm and damages to Millennium and its trade secret information if not restrained.

**WHEREFORE**, Millennium prays for judgment against Defendants, jointly and severally, and requests the Court grant the following relief:

A.  Entry of Temporary Restraining Order against Roberts and HealthTrackRx/AIT, consistent with the relief as requested in Plaintiff's Motion for a Temporary Restraining Order and Memorandum in Support;

B.  Entry of a Preliminary Injunction, and, upon final disposition, entry of a Permanent Injunction against Roberts and HealthTrackRx/AIT, enjoining them from using, referencing or disclosing Millennium's trade secrets under the Defend Trade Secrets Act, and any other applicable relief as set forth in Plaintiff's Motion for a Temporary Restraining Order and Memorandum in Support;

C.  For actual, compensatory and exemplary damages to be determined at trial;

D.  For attorneys' fees in accordance with the Defend Trade Secrets Act; and

E.  Such other and further relief the court deems as just.

## COUNT V
**Tortious Interference with Contractual Relations**
**(Injunctive Relief and Damages)**
**Against HealthTrackRx/AIT**

147.     Millennium realleges and incorporates by reference Paragraphs 1 through 146 as though fully set forth herein.

148.     Roberts signed a valid and enforceable contract, the Agreement, in which Roberts promised, among other things, not to compete and not to disclose Millennium's confidential information.

149.     HealthTrackRx/AIT had knowledge of the Agreement and Roberts' contractual obligations.

150.     HealthTrackRx/AIT nevertheless intentionally interfered with the contractual relationship between Millennium and Roberts by inducing him to breach his contract by disclosing confidential information and joining a competitive business, especially considering the similarities and the competitive nature of the businesses, as well as Roberts' high-level role.

151.     HealthTrackRx/AIT's intentional interference with the contractual relationship between Millennium and Roberts was improper and without justification. HealthTrackRx/AIT knew Roberts is bound by the restrictive covenants in his Agreement, and nevertheless improperly induced and knowingly and intentionally employed him in violation of those covenants.

152.     HealthTrackRx/AIT's actions were improper, unjustified, malicious and in reckless disregard for Millennium's rights, entitling Millennium to damages.

153.     Millennium has suffered and will continue to suffer damages and irreparable harm as a direct result of HealthTrackRx/AIT's tortious interference with contractual relations, including diminished value of its confidential information, loss of customers, harm to its goodwill and reputation, and loss of its competitive advantage.

154. Millennium's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

155. HealthTrackRx/AIT's actions will continue to cause irreparable harm and damages to Millennium if not restrained.

**WHEREFORE**, Millennium prays for judgment against HealthTrackRx/AIT, jointly and severally, and requests the Court grant the following relief:

A. Entry of a Temporary Restraining Order against Roberts and HealthTrackRx/AIT, consistent with the relief as requested in Plaintiff's Motion for a Temporary Restraining Order and Memorandum in Support;

B. Entry of a Preliminary Injunction, and, upon final disposition, entry of a Permanent Injunction against HealthTrackRx/AIT, enjoining HealthTrackRx/AIT from interfering with Millennium's contractual relationship with Roberts;

C. For actual, compensatory and exemplary damages to be determined at trial; and

D. Such other and further relief the court deems as just.

## PRAYER FOR RELIEF

With respect to its Verified Complaint, and based on the foregoing, Plaintiff Millennium Health, LLC prays for the following relief:

1. For one year following termination of Roberts' employment with Millennium, Roberts shall not provide, whether as an owner, shareholder, officer, director, manager, supervisor, employee or agent, services that are the same or similar in function or purpose to the services Roberts provided to Millennium during the last two years of employment to any business that is competitive (as that term is defined in the Agreement) with any aspect of Millennium's business as to which Roberts had material-business related involvement or about which Employee received

Confidential Information (as that term is defined in the Agreement) during the last two years of employment, including, but not limited to, HealthTrackRx/AIT.  This restriction is reasonable due to the comprehensive nature of Roberts' positions at Millennium and HealthTrackRx/AIT;

2.      Defendant Roberts is enjoined from using or disclosing any trade secret, proprietary, or Confidential Information (as defined in the Agreement) of Millennium;

3.      Defendants are enjoined from misappropriating, using, disclosing, or referencing any of Millennium's trade secrets under the Ohio Uniform Trade Secrets Act and Defend Trade Secrets Act;

4.      Defendant Roberts is enjoined from working for or consulting on behalf of HealthTrackRx/AIT in any capacity, including Chief Executive Officer or any other high level position, under the inevitable disclosure doctrine of the Ohio Uniform Trade Secrets Act;

5.      Defendant HealthTrackRx/AIT is prohibited from employing Defendant Roberts in any capacity, including Chief Executive Officer or any other high level position, under the inevitable disclosure doctrine of the Ohio Uniform Trade Secrets Act and as a result of tortious interference with Roberts' Agreement;

6.      Defendant HealthTrackRx/AIT shall not interfere with Roberts' contractual non-compete and confidentiality and non-disclosure obligations to Millennium;

7.      Defendant Roberts shall immediately return all devices containing Millennium information to Millennium, and shall immediately make devices which he used in the course of his employment with Millennium available for forensic review;

8.      Defendant HealthTrackRx/AIT shall ensure it does not possess any trade secret, proprietary, or Confidential Information of Millennium, and shall put into place appropriate guards to ensure it does not come into possession of such information;

9.      For one year from the date of Defendant Roberts' termination of employment with Millennium, Defendant Roberts shall not directly or indirectly, knowingly solicit, induce, or encourage or attempt to solicit, induce, or encourage any other employee of Millennium who worked for Millennium during the eighteen (18) months preceding Roberts' termination of employment to terminate his or her employment with Millennium, or hire any employee of Millennium with whom Roberts worked during the last eighteen (18) months of employment or regarding which Roberts possesses Confidential Information;

10.     Award to Millennium of attorneys' fees and costs under the Ohio Uniform Trade Secrets Act and Defend Trade Secrets Act in connection with the instant motion; and

11.     Award Millennium any and all additional relief that the Court deems equitable, just and proper.

## <u>JURY DEMAND</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Millennium Health, LLC hereby asserts its right to a trial by jury on all counts so triable.

Dated:  October 14, 2019

Respectfully submitted,

MILLENNIUM HEALTH, LLC

By:  */s David A. Riepenhoff*
David A. Riepenhoff, Esq.
**FISHEL DOWNEY ALBRECHT & RIEPENHOFF LLP**
7775 Walton Parkway, Suite 200
New Albany, Ohio 43054
Tel: (614) 221-1216
Fax: (614) 221-8769
driepenhoff@fisheldowney.com

Kevin M. Cloutier, Esq. (*pro hac vice* pending)
Shawn D. Fabian, Esq. (*pro hac vice* pending)
David M. Poell, Esq. (*pro hac vice* pending)
Amy I. Harwath, Esq. (*pro hac vice* pending)
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
70 West Madison Street, 48th Floor
Chicago, Illinois 60602
Tel: (312) 499-6300
Fax: (312) 499-6301
kcloutier@sheppardmullin.com
sfabian@sheppardmullin.com
dpoell@sheppardmullin.com
aharwath@sheppardmullin.com

*Counsel for Millennium Health, LLC*

## DECLARATION

Pursuant to 28 U.S.C. § 1746,  I declare under penalty of perjury under the laws of the

United States of America that the statements contained in Paragraphs 18, 21, 22, 28-46, 48, 50-52,

55, 56, and 59 of the Verified Complaint related to Plaintiff Millennium Health, LLC are true and

correct to the best of my knowledge and belief.

Susan Joseph
Director, Human Resources
Millennium Health, LLC

Executed on Date: 10/11/19

## <u>DECLARATION</u>

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the statements contained in Paragraphs 11-17 and 19-27 of the Verified Complaint related to Plaintiff Millennium Health, LLC are true and correct to the best of my knowledge and belief.

<u>DocuSign by:</u>

604900745135400...

Kristen Baker
Regional Sales Director
Millennium Health, LLC

Executed on Date: <u>Oct. 11, 2019</u>