UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MILLENNIUM HEALTH, LLC, | ) | Case No. 1:19CV2381 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | Mag. Judge David A. Ruiz |
| v. | ) | |
| | ) | |
| CHRISTOPHER ROBERTS, et al., | ) | |
| | ) | |
| Defendants. | ) | REPORT AND RECOMMENDATION |

## I.    INTRODUCTION

Plaintiff Millennium Health, LLC (Millennium) filed a complaint for injunctive relief and damages against its former employee Christopher Roberts (Roberts) and his new employer HealthTrackRx, Inc. (HealthTrackRx) and American Institute of Toxicology, Inc. (AIT).  (R. 1.) The complaint contains five counts, alleging: 1) breach of contract (non-competition) against Roberts (R. 1, PageID #: 18-22); 2) breach of contract (disclosure of confidential information) against Roberts  (R. 1, PageID #: 22-26); 3) misappropriation of trade secrets, in violation of Ohio Rev. Code § 1333.61, against all defendants (R. 1, PageID #: 26-31); 4) misappropriation of trade secrets, in violation of 18 U.S.C. §§ 1836, 1839, against all defendants (R. 1, PageID #: 32-37); and 5)  tortious interference with contractual relations against HealthTrackRx and AIT (R. 1, PageID #: 38-39).  Millennium has moved this court for a preliminary injunction based in large part on the March 8, 2013 Agreement Regarding Confidentiality, Non-Disclosure and Non-Competition that Roberts signed as part of his employment with Millennium. (R. 1, PageID #: 10; R. 1-1, PageID #: 46-57, hereinafter, "Agreement").

The same day Millennium filed the Complaint, it also filed a motion for temporary restraining order (TRO).  (R. 2.)  The court held a hearing on the TRO motion, denied the motion, and scheduled an evidentiary hearing before the undersigned magistrate judge for a preliminary/permanent injunction.  (R. 16, *see also* R. 19, 32, 33.)  After the court granted a joint motion to continue the hearing (R. 19), the undersigned conducted a full-day hearing, during which the parties presented testimony and evidence.  (R. 38, 39.)  The parties have each filed post-hearing briefs.  Millennium's post-hearing brief includes proposed findings of fact and conclusions of law (R. 44), and the defendants' post-hearing briefing includes a closing statement (R. 43), along with proposed findings of fact and conclusions of law.  (R. 42).

Based on the testimony and evidence received at the preliminary injunction hearing, and after considering the parties' pertinent filings and applicable law, the undersigned submits this Report and Recommendation.  For the following reasons, it is recommended that Plaintiff's motion for a preliminary injunction be denied.

## II.  ANALYSIS

### A.  Relevant Factual Background

1.  Millennium and HealthTrackRx (formerly, Pacific Labs) are both toxicology testing companies that measure the presence or absence of drugs in a person. (R. 39, Hearing Transcript ("tr."), at 23-24, 29, 257, 316 [PageID #: 351-352, 357, 585, 644]; R. 43-1, Dietz[1] dep. tr., at 27, 96, 148 [PageID #: 1117, 1125, 1128].)

---

[1] William Dietz is a HealthTrackRx/AIT board member and was deposed as their Fed.R.Civ.P 30(b)(6) corporate representative.

2.      AIT is a HealthTrackRx company where HealthTrackRx's lab testing is performed.  HealthTrackRx and AIT share the same management team.  (R. 39, tr., at 217; R. 40-2, Dietz dep., at 215-216 [PageID #: 545, 738].)

3.      Millennium provides urine drug testing, which comprises 95% of its business, as well as oral fluid drug testing, pharmacogenetic testing, and hereditary cancer-risk testing.  (R. 39, tr., at 23-25, 31, 69-70 [PageID #: 351-353, 359, 397-398].)  HealthTrackRx provides toxicology testing, which comprises 40% of its business, drug testing, infectious disease testing, and an algorithm for drug monitoring.  (R. 43-1, Roberts dep., at 12; Dietz dep. tr., at 96, 144 [PageID #: 1125, 1127, 1147].)

4.      There is evidence that Millennium and HealthTrackRx compete in a minor way in urine toxicology testing.  (R. 39, tr., at 31, 69-71 [PageID #: 359, 397-399].)  There is also evidence that high-level sales executives at Millennium were not aware of the existence of HealthTrackRx.  Sarah Gunhouse, Millennium's Senior Vice President of Sales and Marketing, testified at the hearing that she had not heard of HealthTrackRx before Roberts left Millennium.  (R. 39, tr., at 72 [PageID #: 400].)  Nicole Moberg, former Chief Sales Officer, testified at the hearing that, during her time at Millennium (2011-2018), she did not know of HealthTrackRx, and did not consider them a competitor.  (R. 39, tr., at 147-148 [PageID #: 475-476].)  HealthTrackRx's 30(b)(6) representative Dietz testified at his deposition that the two companies were not competitors in many areas, such as infectious disease testing.  (R. 41, Dietz dep. tr., at 179-180 [PageID #: 941-943].)

5.      Millennium's customers include physicians, clinics, hospitals, and treatment centers, in all 50 states.  (R. 39, tr., at 26, 28 [PageID #: 354, 356].)  HealthTrackRx has the same

3

types of customers nationwide, but with a primary focus on large hospital chains and large clinic networks.  (R. 39, tr., at 258 [PageID #: 586]; R. 40-2, Dietz dep., at 96, 148-149 [PageID #: 715, 727].)

6.      Millennium takes measures to protect confidential information it perceives as providing a competitive advantage.  (R. 39, tr., at 96 [PageID #: 424].)  Millennium employees receive Millennium's policies and procedures regarding the protection of confidential information, and are required to acknowledge they have read, understood, and will adhere to them.  (R. 39, tr., at 97 [PageID #: 425].)  Millennium provides training to employees regarding confidential information.  New hires in sales participate in a presentation by Millennium's legal team that explains what it considers confidential and trade secret information, as well as employees' responsibilities to protect it.  (R. 39, tr., at 102-103 [PageID #: 430-431].)  Roberts received that training.  (R. 39, tr., at 104 [PageID #: 432].)

7.      Millennium's computer networks are password-protected; Millennium limits employee access to information; access to systems, data, files, and communications is based on an employee's role and responsibilities.  (R. 39, tr., at 107 [PageID #: 435].)

8.      Millennium takes steps to protect its confidential information when employees leave the company, by disabling network access and providing departing employees with an exit package that contains a copy of their confidentiality agreement; it requires the departing employee to confirm receipt of the confidentiality agreement and that they have returned all Millennium confidential information and equipment.  (R. 39, tr., at 107 [PageID #: 435].)

9.      Millennium hired Roberts in October 2010, and he worked at Millennium for nine years in sales and leadership roles while residing in Medina, Ohio.  (R. 1, ¶4; R. 39, tr., at 219,

4

260 [PageID #: 547, 588].)  Initially hired as a Sales Representative for Northern Ohio, he was promoted to Senior Sales Specialist for Northern Ohio in April 2011.  (R. 37, PageID #: 308.) Millennium promoted Roberts to Regional Manager for the Midwest Region in January 2012. The Midwest Region included Ohio, Indiana, Illinois, and Missouri.  *Id.*

10.     On March 8, 2013, Roberts signed the Agreement Regarding Confidentiality, Non-Disclosure and Non-Competition (R 1-1; R. 44-4, JX 2), which contains numerous restrictive covenants, addressed *infra*, including a one year non-compete provision.  (R. 37, PageID #: 309; R. 39, tr., at 101 [PageID #: 429].)

11.     The Agreement stated that Roberts was an at-will employee, "which means that either Company or Employee may terminate Employee's employment at any time, with or without notice and with or without cause."  (R. 44-4, JX 2-3, Agreement ¶ 1); *see also* R. 1-1 (Agreement.)

12.     In July 2016, Millennium promoted Roberts to Regional Director for the Central Region, which included half of Arkansas, Illinois, Iowa, Indiana, Kansas, Kentucky, Michigan, Minnesota, Mississippi, Missouri, Nebraska, North Dakota, Ohio, Oklahoma, Pennsylvania, South Dakota, Tennessee, and Wisconsin.  (R. 37, PageID # 309.)  Roberts oversaw a sales team of approximately 37 employees, and reported directly to Millennium's Vice President of Sales. *Id.*  The Central Region did not include Texas. (R. 39, tr., at 233 [PageID #: 561].)

13.     As a Regional Sales Director, Roberts was involved in revenue generation, region growth, team management, and strategic planning.  (R. 39, tr., at 32 [PageID #: 360].)  He was responsible for developing the sales team in his region, and was the liaison between Millennium's executive team and that sales team.  (R. 39, tr., at 32 [PageID #: 360].)  Roberts

5

ranked number one every month in 2019 for Millennium's President's Club based on his productivity in sales, and growing volume and revenue. (R. 40-5, Roberts dep., at 36-37 [PageID #: 834-835].) Roberts worked directly with regional managers; he managed growth, growth strategy expectations, and performance issues; he worked on corporate projects and strategies. (R. 43-1, Baker dep., at 15 [PageID #: 1137].)

14. Roberts had knowledge of Millennium's relationships with customers, such as clinics, physicians, and treatment centers; employee performance metrics; sales and marketing training, techniques, and strategies; customer lists, contacts, locations, preferences and practices, requirements, profitability, order history and volumes, payor mixes, and strategies for serving and marketing existing and prospective customers; nationwide sales structure, prospective sales, and marketing programs; business plans and strategies, including growth strategies, advanced sales strategies, and customer growth plans; and strategic relationships, goals and forecasts with respect to those relationships. (R. 39, tr., at 42, 58-60 [PageID #: 370, 386-388].)

15. Millennium considers information relating to employee metrics, sales structure and markets—such as the top sales representatives, where they are located, and the revenue and volume they generate—confidential because it could enable a competitor to see which markets Millennium has identified as sustainable. (R. 39, tr., at 58, 60 [PageID #: 386, 388].)

16. Although Roberts was responsible for Millennium's Central Region, he also worked with some customers who had operations outside of the Central Region. Roberts participated in Millennium's annual national sales conferences, most recently in Dallas, Texas. (R. 39, tr., at 42-43 [PageID #: 370-71].)

6

17.     From June to November of 2018, while Millennium was looking for a new vice-president of sales, Roberts and the two other Regional Directors reported directly to the CEO. (R. 39, tr., at 89 [PageID #: 417]; R. 40-3, Gunhouse dep., at 67-68 [PageID #: 777-778].)

18.     A main focus of Roberts while at Millennium was growing sales, volume and revenue, and he estimates he generated hundreds of millions of dollars in revenue for the company from 2013-2019. (R. 39, tr., at 230 [PageID #: 558].)

19.     Roberts regularly participated in Millennium's new hire training and sales training, including training relating to corporate policy and compliance. (R. 39, tr., at 61 [PageID #: 389].)

20.     Roberts helped develop strategies for Millennium, while a Regional Director.  He was involved in initiatives and strategies that related to and impacted Millennium's business on a national level.  (R. 39, tr., at 60, 88 [PageID #: 388, 416].)  Roberts interacted frequently with the two other Regional Directors, who would share their ideas, best practices, and brainstorm business plans together. (R. 39, tr., at 43-44 [PageID #: 371-372].)  In June 2019, Roberts developed a business plan, which laid out his sales strategy for the second half of the year. Roberts met with Millennium executives and the other two Regional Directors, and together they reviewed all three Regional Directors' business plans.  Roberts' business plan summarized strengths, weaknesses, opportunities, and threats relating to the Central Region's business, as well as growth initiatives.  (R. 39, tr., at 46-47 [PageID #: 374-375].)  Millennium considers the information in the business plans confidential because it demonstrates how the company planned to achieve certain plans, potential obstacles and proposed solutions for overcoming those obstacles.  (R. 39, tr., at 48 [PageID #: 376].)

21.     Roberts participated in a regular national pipeline call with the other Regional Directors, regional managers, the CEO, CFO, and CIO to discuss opportunities of significant value (at least a half million dollars in revenue), strategies, and resources to obtain such business. During these calls, Roberts heard about significant customer opportunities and Millennium business losses outside of the Central Region.  (R. 39, tr., at 33 [PageID #: 361].)  Millennium considers the information discussed on such calls confidential and restricted to the sales leadership and executive team, because a competitor could benefit by learning where Millennium has significant volume or is at risk. (R. 39, tr., at 33-34, 60 [PageID #: 361-362, 388].)

22.     Roberts was involved in weekly direct billing meetings, where he met with the other Regional Directors and Millennium's finance team to discuss customer accounts that had requested direct billing arrangements, as opposed to paying through insurance, and the specific pricing based on test mixes and volume—information Millennium considers confidential. (R. 39, tr., at 54-55 [PageID #: 382-383].)

23.     Roberts was familiar with Millennium's relationships with private insurers, the health plans with which Millennium had contracts, as well as Millennium's pricing under those contracts. (R. 39, tr., at 28 [PageID #: 356].)

24.     Roberts was exposed to customer data within his region, on Millennium's customer relationship management database, such as customer volume, payor mixes, customer preferences and strategies. (R. 39, tr., at 59, 105, 123 [PageID #: 387, 433, 451].)

25.     Roberts was involved in Millennium's sales campaigns, and participated in national calls where the strategies underlying various campaigns were discussed.  One recent campaign in which Roberts was involved, called "Welcome Back," was an effort to regain

former Millennium customers.  The information underlying the "Welcome Back" campaign, such as the list of customers targeted, their value to Millennium, their previous volumes, and the strategies for regaining them, is considered confidential by Millennium.  (R. 39, tr., at 34-35, 74 [PageID #: 362-363, 402].)

26.     Roberts spearheaded an initiative this past year to identify a blood-testing lab partnership based on Millennium customer requests for a blood lab service.  Roberts knew which customers were most interested in the service—information Millennium considers confidential.  (R. 39, tr., at 35-36 [PageID #: 363-364].)  With the assistance of Millennium's legal department, Roberts helped negotiate a contract with a potential blood lab partner.  (R. 39, tr., at 36 [PageID #: 364].)  Roberts participated in an initial discussion with the CEO of another lab, and attended an in-person meeting at that lab in Austin, Texas with Millennium's CEO to discuss a strategic partnership.  (R. 39, tr., at 36-37 [PageID #: 364-365].)

27.     Roberts was designated to be the Regional Director representing Millennium's sales organization in a customer business review task force.  The customer business review identified Millennium's top 40 customers, and shared confidential information with them regarding test results and customer-specific information, to demonstrate Millennium's value as a business partner.  (R. 39, tr., at 38 [PageID #: 366]; R. 40-3, Gunhouse dep., at 88 [PageID #: 788].)

28.     Roberts was the appointed sales leadership representative on the Upper Limits of Linearity Committee, where he helped craft messaging to customers and the sales organization about why Millennium revised certain reportable test ranges.  According to Millennium, this messaging was important to allay customer concerns about the reportable range of certain tests,

and to ensure they understood how to interpret their test results. (R. 40-3, Gunhouse dep., at 41-45 [PageID #: 758-762].)

29.     In late July 2019, HealthTrackRx engaged Jason Bristol, a former Millennium sales vice president, as a consultant, regarding improving HealthTrackRx's sales force.  (R. 39, tr., at 62-63, 240; R. 40-2, Dietz dep., at 228-229 [PageID #: 390-391, 568, 741].)

30.     On August 8, 2019, HealthTrackRx's board discussed the company's stagnant growth and the fact that HealthTrackRx was not meeting its goals with respect to specimen volume thresholds.  The board decided to move forward with finding a new CEO for the company who could help HealthTrackRx's volume and revenue grow.  (R. 43-1, Dietz dep., at 23, 84; R. 40-2, Dietz dep., at 113-114 [PageID #: 719-720, 1116, 1124].)

31.     In August 2019, Bristol recommended Roberts as a potential CEO candidate during a phone call with two board members.  Bristol previously worked with Roberts at Millennium, and called him to gauge his interest in a CEO-level opportunity.  (R. 39, tr., at 238-240, 267; R. 43-1, Dietz dep., at 39-40 [PageID #: 566-568, 595, 1119].)  Bristol arranged a call for the second week of August between Roberts and Matt Patton, a HealthTrackRx board member, who told Roberts the opportunity was with HealthTrackRx.  (R. 39, tr., at 270-271 [PageID #: 598-599].)

32.     On August 29, 2019, Roberts had a day-long in-person interview with eight or nine people at HealthTrackRx's Denton, Texas headquarters.  They discussed HealthTrackRx's business, including toxicology testing, urine testing, blood testing, and oral fluid testing.  (R. 39, tr., at 267, 273; R. 43-1, Dietz dep., at 53 [PageID #: 595, 601, 1122].)  They also discussed Roberts' professional experience, including strategic planning, sales training, customer retention,

and sales forecasting.  Roberts and HealthTrackRx also discussed building a sales team, and how HealthTrackRx needed help growing the company.  (R. 39, tr., at 278, 286, 315-316 [PageID #: 606, 614, 643-644].)

33.    Roberts testified that he told HealthTrackRx, at the meeting, about his non-compete agreement with Millennium.  (R. 40-5, Roberts dep., at 157 [PageID #: 869].)  Board member Dietz testified that he was informed of that agreement, but recalled it occurring during a phone call.  (R. 40-2, Dietz dep., at 189 [PageID #: 735].)

34.    Board member Dietz asked Roberts to prepare a revenue growth plan following the August 29 interview, which Roberts completed sometime in early September 2019, when he was still employed at Millennium.  (R. 39, tr., at 282; R. 40-2, Dietz dep., at 76-77 [PageID #: 610, 710].)  In the plan, Roberts wrote that HealthTrackRx needed a better presence to let potential customers know about its product offerings.  (R. 39, tr., at 290 [PageID #:  618].)  Roberts proposed building a lean and high-functioning sales team. (R. 39, tr., at 291 [PageID #: 619].)  "The primary sales focus will be on growing our Infectious Disease product offering."  (R. 43-1, PageID #: 1176.)  Roberts proposed specific goals for each sales representative, based on his discussions with HealthTrackRx.  (R. 39, tr., at 291 [PageID #:  619].)

35.    On September 13, 2019, HealthTrackRx's board had a phone call and decided to continue discussions with Roberts.  (R. 40-2, Dietz dep., at 55, 58 [PageID #: 707-708].)  Before the call, Dietz compiled information about Roberts for the board, his revenue growth plan, and a document entitled "Project Pegasus" that referenced parameters for the CEO position.  The "Project Pegasus" sheet indicated that HealthTrackRx was seeking a person who would fulfill responsibilities of a traditional CEO, and also serve the sales function previously occupied by

their former head of sales, and other related sales functions. (R. 40-2, Dietz dep., at 56-57, 101-102, 116-117 [PageID #: 707, 716-717, 720].)

36. Dietz called Roberts after the September 13 meeting to inform him of the board's unanimous support to continue discussions with him about the CEO opportunity. (R. 40-2, Dietz dep., at 60 [PageID #: 708]; R. 40-5, Roberts dep., at 189 [PageID #: 883].)

37. Roberts gave a copy of his Millennium employment Agreement to HealthTrackRx on October 1, 2019. (R. 37, PageID #: 309; R. 40-5, Roberts dep., at 157 [PageID #: 869].)

38. Roberts resigned from Millennium on October 4, 2019, and asked for a release from his non-compete agreement. (R. 37, PageID #: 309; R. 39, tr., at 281 [PageID #: 609]; R. 40-5, Roberts dep., at 205 [PageID #: 888].)

39. On October 7, 2019, Millennium sent HealthTrackRx a letter regarding Roberts' post-employment contractual obligations to Millennium, including his non-competition, confidentiality, and non-disclosure obligations. (R. 1-1, verified compl., at para. 48 [PageID #: 15].)

40. Roberts began his employment at HealthTrackRx on October 8, 2019, in Denton, Texas. (R. 37, [PageID #: 309]; R. 39, tr., at 281 [PageID #: 609].) Roberts is currently the Chief Executive Officer of both HealthTrackRx and AIT, a laboratory owned by HealthTrackRx. (*Id*; R. 39, tr., at 217 [PageID #: 545].)

41. Roberts oversees all aspects of HealthTrackRx's business, including sales. Roberts characterized sales as a driving force for revenue growth at HealthTrackRx. (R. 39, tr., at 250-251, 291, 302 [PageID #: 578-579, 619, 630].) HealthTrackRx's 30(b)(6) representative, Dietz, testified that HealthTrackRx believes Roberts' strong background in sales at Millennium

12

will benefit all areas of HealthTrackRx.  HealthTrackRx has not created a formal barrier or silo between Roberts and the sales department, which is one of the departments he oversees. (R. 39, tr., at 302-303; R. 40-2, Dietz dep., at 6; R. 43-1, Dietz dep., at 85 [PageID #: 630-631, 696, 1124].)

42.    As CEO, Roberts' duties include company strategy, helping create business plans or overseeing the business plans for each of the different departments.  (R. 40-5, Roberts dep., at 15 [PageID #: 827].)  One of Roberts' goals is to grow the company, and to increase HealthTrackRx's market share.  (R. 39, tr., at 259-260 [PageID #: 587-588].)

43.    Although Roberts' role as a Regional Sales Director for Millennium and his role as CEO for HealthTrackRx have some parallel responsibilities in terms of driving revenue growth for each organization (R. 39, tr., at 84, 259 [PageID #: 412, 587]), Roberts' role at Millennium was primarily to implement strategic goals or initiatives that were created by others, the executive group.  (R. 39, tr., at 30-31, 86, 220-221 [PageID #: 358-359, 414, 548-549].)  His role at Millennium had changed recently, such that he was no longer allowed the autonomy he once had, for example, in terms of hiring decisions.  (R. 39, tr., at 222-223 [PageID #: 550-551].) As CEO at HealthTrackRx, Roberts creates strategic plans for every department, and makes executive decisions for the company overall. (R. 39, tr., at 237-238, 250-251 [PageID #: 565-566, 578-579]; R. 40-2, Dietz dep., at 109 [PageID #: 718].)

44.    On October 11, 2019, Robert Nimsger, a former Millennium employee hired into HealthTrackRx before Roberts, emailed Roberts and two others to invite them to a meeting with the owners of a prospective customer in California with a six-location family practice.  (R. 39, tr., at 311-312 [PageID #: 639-640].)  Roberts declined to attend the meeting with the

prospective customer.  (R. 39, tr., at 322-323 [PageID #: 650-651].)  On the following Monday, Roberts informed the entire sales team, executive team and business development team about his restrictive covenants and his intention to adhere to them, that he could not be involved in any sales meetings, and that he was not customer-facing, because he was the CEO of the company. (R. 39, tr., at 323-24 [PageID #: 651-52].)

45.     At the hearing, Millennium's Human Resources Director, Susan Joseph, testified that Roberts returned his Millennium-issued devices; he stated in writing that he returned all proprietary and confidential information and that "he doesn't have anything in his possession[;]" and that she was not aware of Roberts "maintaining any [Millennium] information…believe[d] to be confidential or trade secret."  (R. 39, tr., at 125-26 [PageID #: 453-54].)

46.     Millennium's Senior VP of Sales, Gunhouse, also testified, but was unable to identify any confidential information or trade secret that Roberts had disclosed to HealthTrackRx.  (R. 39, tr., at 79 [PageID #: 407].)  Gunhouse could not identify a single Millennium customer that had been lost to HealthTrackRx.  (R. 39, tr., at 73 [PageID #: 401].) Gunhouse was unable to identify a single customer of Millennium's that Roberts had tried to solicit for HealthTrackRx, nor could she identify any customer that he urged or encouraged others at HealthTrackRx to solicit.  (R. 39, tr., at 79-80 [PageID #: 407-408].)

47.     Roberts' compensation as CEO is tied to HealthTrackRx's revenue increases.  (R. 39, tr., at 260, 298, 300; R. 40-2, Dietz dep., at 159-160, 162 [PageID #: 588, 626, 628, 730-731].)

### B. Millennium's Requested Relief

Millennium seeks the following injunctive relief, based in large part on the March 8, 2013 Agreement signed by Roberts:[2]

1. For one year following termination of Roberts' employment with Millennium, Roberts shall not provide, whether as an owner, shareholder, officer, director, manager, supervisor, employee or agent, services that are the same or similar in function or purpose to the services Roberts provided to Millennium during the last two years of employment to any business that is competitive (as that term is defined in the Agreement) with any aspect of Millennium's business as to which Roberts had material-business related involvement or about which Employee received Confidential Information (as that term is defined in the Agreement) during the last two years of employment, including, but not limited to, HealthTrackRx/AIT.

2. Enjoining Roberts from using or disclosing any trade secret, proprietary, or Confidential Information (as defined in the Agreement) of Millennium;

3. Enjoining Defendants from misappropriating, using, disclosing, or referencing any of Millennium's trade secrets under the Ohio Uniform Trade Secrets Act and Defend Trade Secrets Act;

4. Enjoining Roberts from working for or consulting on behalf of HealthTrackRx/AIT in any capacity, including Chief Executive Officer or any other high level position, under the inevitable disclosure doctrine of the Ohio Uniform Trade Secrets Act;

5. Prohibiting HealthTrackRx/AIT from employing Roberts in any capacity, including Chief Executive Officer or any other high level position, under the inevitable disclosure doctrine of the Ohio Uniform Trade Secrets Act and as a result of tortious interference with Roberts' Agreement;

6. Prohibiting HealthTrackRx/AIT from interfering with Roberts' contractual noncompete and confidentiality and non-disclosure obligations to Millennium;

7. Ordering Roberts to return all devices containing Millennium information to Millennium, and to make devices which he used in the course of his employment with Millennium available for forensic review;

---

[2] R. 1, PageID #: 10; R. 1-1, PageID #: 46-57.

15

8. Ordering HealthTrackRx/AIT to ensure it does not possess any trade secret, proprietary, or Confidential Information of Millennium, and to implement appropriate guards to ensure it does not come into possession of such information;

9. For one year from the date of Roberts' termination of employment with Millennium, prohibiting Roberts from directly or indirectly, knowingly soliciting, inducing, or encouraging or attempting to solicit, induce, or encourage any other employee of Millennium who worked for Millennium during the eighteen (18) months preceding Roberts' termination of employment to terminate his or her employment with Millennium, or hire any employee of Millennium with whom Roberts worked during the last eighteen (18) months of employment or regarding which Roberts possesses Confidential Information;

10. Ordering an award to Millennium of attorneys' fees and costs under the Ohio Uniform Trade Secrets Act and Defend Trade Secrets Act in connection with the motion for injunctive relief; and

11. Ordering an award to Millennium for any and all additional relief that the Court deems equitable, just and proper.

(R. 1, PageID #: 39-41.)

### C.  Preliminary Injunction Standard

"A preliminary injunction is an extraordinary and drastic remedy." *S.Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (quoting *Munaf v. Geren*, 553 U.S. 674, 689-690 (2008)).  The party seeking the injunction must establish its case by clear and convincing evidence.  *Honeywell, Inc. v. Brewer-Garrett Co.*, 145 F.3d 1331, 1998 WL 152951, at *3 (6th Cir. 1998) (TABLE, text in WESTLAW) (citing *Garlock, Inc. v. United Seal, Inc.*, 404 F.2d 256, 257 (6th Cir. 1968)); *Invacare Corp. v. Nordquist*, No. 1:18CV62, 2018 WL 2454523, at *3 (N.D. Ohio June 1, 2018); *see also Procter & Gamble Co. v. Stoneham*, 140 Ohio App.3d 260, 268, 747 N.E.2d 267, 273 (Ohio Ct. App. 2000).  Before a preliminary injunction can be issued, the court must consider the following four factors:

1. Whether the movant has shown a strong or substantial likelihood of success on the merits;

2. Whether the movant has shown irreparable injury without the injunction;

3. Whether the preliminary injunction would substantially harm third parties; and

4. Whether the public interest would be served by issuing the preliminary injunction.

*BNSF Ry. Co. v. Tennessee Dep't of Revenue*, 800 F.3d 262, 268 (6th Cir. 2015); *City of Pontiac Retired Employees Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014); *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005), *cert. denied*, 546 U.S. 824 (2005) ("strong likelihood"); *Hamad v. Woodcrest Condominium Ass'n*, 328 F.3d 224, 230 (6th Cir. 2003) ("substantial likelihood"); *Invacare Corp.*, 2018 WL 2454523, at *3; *PolyOne Corp. v. Kuta*, 67 F.Supp.3d 863, 869 (N.D. Ohio 2014); *see also Procter & Gamble*, 140 Ohio App.3d at 267, 747 N.E.2d at 273. These factors are not prerequisites, but factors to be balanced against one another. *Overstreet v. Lexington-Lafayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002); *Avery Dennison Corp. v. Juhasz*, 924 F.Supp.2d 893, 899 (N.D. Ohio 2013).

Although the court balances these four considerations, the movant must always demonstrate some irreparable harm before the injunction will issue. *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 104 (6th Cir. 1982); *Basicomputer Corp. v. Scott*, 791 F.Supp. 1280, 1285 (N.D. Ohio 1991), *aff'd*, 973 F.2d 507 (6th Cir. 1992). The Supreme Court has stated that "the basis of injunctive relief in the federal courts has always been irreparable harm and the inadequacy of legal remedies." *Sampson v. Murray*, 415 U.S. 61, 88 (1974) (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-507 (1959)); *Economou v. Physicians Weight Loss Centers of Am.*, 756 F.Supp. 1024, 1038 (N.D. Ohio 1991). A plaintiff's

harm is generally not "irreparable" if it is fully compensable by money damages. *Overstreet,* 305 F.3d at 578 (citing *Basicomputer Corp. v. Scott,* 973 F.2d 507, 511 (6th Cir. 1992)); *Honeywell,* 1998 WL 152951, at *3.

Further, when balancing the pertinent factors on a case-specific basis, the reviewing court may:

> grant a preliminary injunction even where the plaintiff fails to show a strong or substantial probability of ultimate success on the merits of his claim, but where he at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction is issued.

*Friendship Materials,* 679 F.2d at 105.  *Accord Six Clinics Holding Corp., II v. Cafcomp Systems, Inc.,* 119 F.3d 393, 400 (6th Cir. 1997); *In re Eagle-Picher Industries, Inc.,* 963 F.2d 855, 860 (6th Cir. 1992).  Generally, the likelihood of success that needs to be demonstrated "will vary inversely with the degree of injury the plaintiff will suffer absent an injunction." *Friendship Materials,* 679 F.2d at 105.  Should Millennium show a strong likelihood of prevailing on the merits, that would permit the court to issue an injunction despite a lesser showing of irreparable harm. *Cabot Corp. v. King,* 790 F.Supp. 153, 155 (N.D. Ohio 1992).

At the preliminary injunction stage, this court does not resolve "doubtful or difficult questions of law or disputed questions of fact." *PolyOne,* 67 F.Supp.3d at 869 (quoting *Neveux v. Webcraft Techs.,* 921 F.Supp. 1568, 1572 (E.D. Mich. 1996)).  The factual findings of the court ruling on a motion for preliminary injunction are not binding in the underlying lawsuit. *Id.* (citing *University of Texas v. Camenisch,* 451 U.S. 390, 395 (1981).)

18

### D.  Conclusions of Law

#### 1.  Likelihood of Success

The court next considers and balances the four factors in determining whether to recommend the issuance of a preliminary injunction.  The first factor is whether Millennium as movant has shown a strong likelihood of success.  *BNSF Ry. Co.*, 800 F.3d at 268; *City of Pontiac Retired Employees*, 751 F.3d at 430; *Invacare Corp.*, 2018 WL 2454523, at *3; *see also Procter & Gamble*, 140 Ohio App.3d at 267, 747 N.E.2d at 273.  The complaint contains multiple counts, each of which will be considered in turn.

#### a.  Breach of Contract

The first two counts allege breach of contract, against Roberts, for violating the non-competition and disclosure of confidential information provisions in the Agreement.  (R. 1, PageID #: 18-22; 22-26; *see generally* R. 1-1, PageID #: 46-57 (Agreement Regarding Confidentiality, Non-Disclosure and Non-Competition); R. 44-4, JX 2 (Agreement), PageID #: 1876-1887.

The initial question is whether the Agreement is valid and enforceable.  Our court has recognized that restrictive employment covenants are inherently problematic:

> Our economy ultimately depends on property rights, enforceable contracts, and
> free market competition.  But when employers seek to limit competition by
> requiring their employees to agree to restrictive employment covenants, those
> foundational principals come into tension.

*Invacare Corp.*, 2018 WL 2454523, at *1.  Ohio courts disfavor restrictive covenants, which are "scrutinized carefully to ensure their intended effect is not to prevent competition, but to protect a legitimate business interest."  *Invacare Corp.*, 2018 WL 2454523, at *4 (citing *MP TotalCare Servs., Inc. v. Mattimoe*, 648 F. Supp. 2d 956, 962 (N.D. Ohio 2009)); *Arthur J. Gallagher & Co.*

19

*v. Anthony*, No. 16CV284, 2016 WL 4523104, at *10 (N.D. Ohio Aug. 30, 2016)). Under Ohio law,

> . . . restrictive employment covenants are enforceable only if an employer proves by clear and convincing evidence that they: (1) are no greater than necessary for protecting an employer's legitimate business interest; (2) do not impose an undue hardship on the restrained employee; and (3) are not against the public interest. Ultimately, the crux of this test is whether the restrictive covenants are reasonable.

*Invacare Corp.*, 2018 WL 2454523, at *4 (citing *Arthur J. Gallagher*, 2016 WL 4523104, at *10); *see also PolyOne*, 67 F.Supp.3d at 869-870; *Procter & Gamble*, 140 Ohio App.3d at 270, 747 N.E.2d at 275 (citing *Raimonde v. Van Vlerah*, 42 Ohio St.2d 21, 325 N.E.2d 544 (1975) (syllabus, ¶2)). Reasonable non-compete agreements are enforced as written. *AK Steel Corp. v. Miskovich*, No. 1:14CV174, 2014 WL 11881029, at *10 (S.D. Ohio April 17, 2014) (citing *Raimonde*, 42 Ohio St.2d at 26, 325 N.E.2d at 547).

When considering the reasonableness of a restrictive employment covenant, the court also considers:

> [W]hether the covenant imposes temporal and spatial limitations, whether the employee had contact with customers, whether the employee possesses confidential information or trade secrets, whether the covenant bars only unfair competition, whether the covenant stifles the employee's inherent skill and expertise, whether the benefit to the employer is disproportionate to the employee's detriment, whether the covenant destroys the employee's sole means of support, whether the employee's talent was developed during the employment, and whether the forbidden employment is merely incidental to the main employment.

*Invacare Corp.*, 2018 WL 2454523, at *4 (citing *PolyOne*, 67 F.Supp.3d at 872); *see also Procter & Gamble*, 140 Ohio App.3d at 270, 747 N.E.2d at 275-276 (citing *Raimonde*, 42 Ohio St.2d at 25, 325 N.E.2d at 547; *Rogers v. Runfola & Assoc., Inc.,* 57 Ohio St.3d 5, 8, 565 N.E.2d 540, 543 (1991)).

20

Roberts signed the Agreement in 2013, while a Regional Manager over Millennium's four-state Midwest Region.  *See* Section II.A. ¶ 9.  Although he was promoted to Regional Sales Director for the Central Region, with a more responsibilities over a seventeen-state territory, the parties did not execute a new employment agreement.  The relevant provisions of the Agreement restrict Roberts from: 1) disclosing confidential information and trade secrets, 2) soliciting Millennium customers, 3) competing with Millennium, and 4) soliciting certain Millennium employees to quit and move to Roberts's new employer.  The provisions provide:

> Non-Disclosure: Employee shall keep in strictest confidence and trust all Confidential Information, and Employee shall not directly or indirectly reveal, report, publish, transfer, disclose, use, access, or sell any Confidential Information, either during Employee's employment or thereafter, or assist in any of the aforementioned actions, except as may be necessary in the ordinary course of properly performing Employee's duties for Company. Employee understands and agrees that the restrictions on use or disclosure of Confidential Information will only apply for two (2) years after the end of Employee's employment where information that does not qualify as a trade secret (as defined by applicable law) is concerned; however, the restrictions will continue to apply to trade secret information for as long as the information at issue remains qualified as a trade secret. Nothing herein shall be construed to require withholding information in violation of any applicable state or federal law, or to prohibit the reporting of information where such is protected by law.

*Id.* at § 2.a.

> Non-Solicitation of Customers: For a period of one year following Employee's termination of employment with Employer, regardless of which party terminates the employment relationship or the reasons for such termination, Employee will not knowingly, directly or indirectly, solicit, divert, or take away, or attempt to solicit, divert or take away, a customer of the Company that Employee had contact with or did business with (in person or through the direction or supervision of others) in the last two years of Employee's employment with the Company, nor shall Employee participate in soliciting or inducing such a customer to buy a competitive product or service. This restriction is understood to be inherently reasonable in its geography because it is limited to the places where said customer(s) do business.

*Id.* at § 3.b.i.

21

> Non-Competition: For a period of one year following Employee's termination of employment with Employer, regardless of which party terminates the employment relationship or the reasons for such termination, Employee shall not, directly or indirectly, provide services that are the same or similar in function or purpose to the services Employee provides to the Employer during the last two years of employment (whether as an owner, shareholder, officer, director, manager, supervisor, employee or agent) to any business that is competitive with any aspect of Employer's business as to which Employee had material-business related involvement or about which Employee received Confidential Information during the last two years of employment in any state, province, or other jurisdiction in which Employee performed services or otherwise assisted the Employer in doing business or preparing to do business during the last two years of employment (the "Restricted Area"). A business shall be considered "competitive" if its products or services would compete with or displace the products and/or services that the Company was engaged in providing or developing at the time Employee's employment with the Company ended. Employee specifically acknowledges and agrees that the foregoing restriction on competition with Employer will not prevent Employee from obtaining gainful employment following the termination of his employment with Employer and is a reasonable restriction to protect the Company's legitimate business interests. Notwithstanding the foregoing, nothing herein shall prohibit Employee from holding a non-controlling interest in a competing business through a passive investment such as mutual fund or through ownership of less than 2% of the publicly traded stock of public corporation, so long as Employee has no material involvement in the operation of the business.

*Id.* at § 3.b.ii.

> Non-Solicitation of Employees: Employee agrees that Employee will not, directly or indirectly, knowingly: solicit, induce, or encourage or attempt to solicit, induce, or encourage any other employee of Company who worked for Company during the eighteen (18) months preceding Employee's termination of employment, to terminate his or her employment with the Company; or hire any employee of the Company with whom Employee worked during the last eighteen (18) months of employment or regarding which Employee possesses Confidential Information. Employee agrees that this restriction will last for one (1) year from the effective date of Employee's termination from Company. If Employee violates this paragraph, in addition to injunctive relief prohibiting further violations, Employee will pay the Company an amount equaling 20% of the previous 12 month's wages of any employee that the Company loses as a result of, in whole or in part, Employee's violation multiplied by the number of complete years the solicited employee worked for the Company, with a maximum damage amount (for ten year employees and above) of 200%. This remedy shall be in addition to, and not in lieu of or a replacement for, injunctive relief.

*Id.* at § 3.b.iii.

The above restrictive provisions are designed to protect Millennium's pricing strategies, service and sales strategies, and customer information and relationships, which are recognized as legitimate business interests. *AK Steel*, 2014 WL 11881029, at *11. When an employee has access to confidential information, and when an employee's customer contacts occurred because of his employment, a legitimate business interest is likely to be present. *Invacare Corp.*, 2018 WL 2454523, at *4. A state appellate court expanded on this issue:

> An employer has a legitimate interest in limiting not only a former employee's ability to take advantage of personal relationships the employee has developed while representing the employer to the employer's established client, but also in preventing a former employee from using his former employer's customer lists or contacts to solicit new customers. * * * In addition, an employer has a legitimate interest in preventing a former employee from using the skill, experience, training, and confidential information the former employee has acquired during the employee's tenure with his employer in a manner advantageous to a competitor in attracting business, regardless of whether it was an already established customer of the former employer.

*Century Bus. Servs., Inc. v. Urban*, 179 Ohio App. 3d 111, 123, 900 N.E.2d 1048, 1058 (Ohio Ct. App. 2008) (quoting *UZ Engineered Prods. v. Midwest Motor Supply Co., Inc.*, 147 Ohio App.3d 382, 396-397, 770 N.E.2d 1068 (Ohio Ct. App. 2001)).

The court finds that the Agreement's provisions concerning non-disclosure of Millennium's confidential information and trade secrets are reasonably intended to protect a legitimate business interest. *See, e.g.*, *AK Steel*, 2014 WL 11881029, at *12. In addition, the court finds that the Agreement's provisions concerning a one-year ban on solicitation of Millennium's customers and employees are reasonably intended to protect a legitimate business interest. *Id.*

23

Roberts, for the most part, does not contest whether the Agreement is valid and reasonable.  *See generally* R. 42, PageID #: 1010-1014.  Rather, he argues that he is in compliance with the Agreement's non-disclosure provisions, *id.* at 1022-1023, 1035; that there is no evidence that he has breached or has threatened to breach the non-compete provisions, *id.* at 1023-1024, 1035-1036; and, that there is no evidence he has violated or will violate the non-solicitation provisions, *id.* at 1024-1029, 1035.  However, he has raised the "undue hardship" element when addressing the reasonableness of the Agreement.  (R. 42.)

Roberts contends that a non-compete agreement that would "prevent a talented individual who had independently cultivated his abilities from practicing his trade or profession" is unreasonable.  (R. 42, PageID #: 1033.)  Roberts asserts that the Agreement, if enforced through the requested injunction, would cause "grievous harm" to him, because he would immediately become unemployed, and he has no other current job prospects.  (R. 42, PageID #: 1029, 1036; *see generally* R. 1, PageID #: 40 (seeking to enjoin Roberts from working for HealthTrackRx and AIT "in any capacity")).  The burden, however, is on the movant.

The Agreement cannot be found enforceable unless Millennium proves by clear and convincing evidence that it does not impose an undue hardship on Roberts as the restrained employee.  *Invacare Corp.*, 2018 WL 2454523, at *4; *see also Procter & Gamble*, 140 Ohio App.3d at 270, 747 N.E.2d at 275.  Millennium contends that the non-compete provision only prohibits Roberts from working for a direct competitor during the one-year period.  (R. 44, PageID #: 1239.)  Millennium also points to evidence that Roberts would likely be able obtain other employment:  before Roberts left Millennium, he received a job offer to be head of sales for a non-competitor, which Millennium concedes would not violate the Agreement.  *Id.* at 1231,

24

1239.  Although Roberts may find other competitive employment, enforcing the Agreement and non-compete provision as Millennium seeks, would undoubtedly impose a hardship after he relocated from Ohio to Texas for a career-advancement opportunity.  The court, however, need not determine whether that would result in an undue hardship, on the limited record, because as discussed *infra* Millennium seeks to impose a nationwide non-compete that is likely to be found unreasonable and unenforceable.

Finally, Millennium asserts that the Agreement is not injurious to the public interest because it does not impact the public's interest in fair business competition.  (R. 44, PageID #: 1239.)  Indeed, if the court enjoined Roberts from working as the CEO at HealthTrackRx, HealthTrackRx could continue to operate by hiring a different CEO.  *Id.*  Roberts does not address whether the Agreement is against the public interest, except to assert that "Millennium has failed to demonstrate any public interest that would be furthered by the issuance of the requested preliminary injunction."  (R. 42, PageID #: 1036.)  The test here, however, is not whether the Agreement furthers a public interest, the test is whether it is "against the public interest."  *Invacare Corp.*, 2018 WL 2454523, at *4.  Here, the court finds that the public interest is balanced:  the public interest is served by preventing unfair competition and by upholding valid contracts between employers and employees.  *See id.* at *8.  On the other hand, restrictive employment covenants may stifle competition.  *Id.*  The court does not find either aspect to be dispositive in this case.  Should the court grant the injunction concerning Roberts' employment, the public would not be deprived of the benefits of toxicology testing by either company.  *See, e.g., FirstEnergy Sols. Corp. v. Flerick*, 521 Fed. Appx 521, 527 (6th Cir. 2013).

25

Although the entire Agreement does not appear patently unreasonable or unenforceable on its face, the court reserves judgment on this issue, because after considering the following factors, the record before this court does not warrant granting a preliminary injunction.

The next issue, then, is whether Millennium has shown by clear and convincing evidence a substantial likelihood that Roberts has breached the Agreement. Millennium has presented no evidence that Roberts breached the Non-Disclosure provision (R. 44-4, JX 2, § 2.a.) of the Agreement. *See generally* R. 44, PageID #: 1226-1247. At the hearing, Millennium's Senior VP of Sales, Gunhouse, could not identify any confidential information or trade secrets that Roberts had disclosed to HealthTrackRx.[3] (R. 39, tr., at 79 [PageID #: 407].) Similarly, Baker, Millennium's Regional Sales Director for the West Region, testified at deposition that she was not aware of any facts indicating that Roberts was using Millennium's confidential information in his current capacity as CEO at HealthTrackRx. (R. 43-1, dep. tr., at 35-36, 51 [PageID #: 1142, 1145].)

Millennium has presented no evidence that Roberts breached the Non-Solicitation of Customers provision (R. 44-4, JX 2, § 3.b.i.) of the Agreement. At the hearing, Gunhouse could not identify a single Millennium customer that had been lost to HealthTrackRx. (R. 39, tr., at 73 [PageID #: 401].) Moreover, Gunhouse was unable to identify a single customer of Millennium's that Roberts had tried to solicit for HealthTrackRx, nor could she identify any customer that he urged or encouraged others at HealthTrackRx to solicit. (R. 39, tr., at 79-80 [PageID #: 407-408].) Regional Sales Director Baker testified at deposition that she had no

---

[3] The issue of confidential information and trade secrets will also be addressed below, concerning Counts III-IV, misappropriation of trade secrets.

knowledge of Roberts soliciting Millennium's customers. (R. 43-1, dep. tr., at 36-38, 47-48 [PageID #: 1142-1143, 1144].) When another HealthTrackRx employee invited Roberts to a meeting with a prospective customer in California, Roberts declined to attend the meeting. (R. 39, tr., at 311-312, 322-323 [PageID #: 639-640, 650-651].) On the following Monday, Roberts informed the entire sales team, executive team and business team of his restrictive covenants and his intention to adhere to them, that he could not be involved in any sales meetings, and that he was not customer-facing, because he was the CEO of the company. (R. 39, tr., at 323 [PageID #: 651].)

Further, Millennium has presented no evidence that Roberts breached the Non-Solicitation of Employees provision (R. 44-4, JX 2, § 3.b.iii.) of the Agreement. Gunhouse was unable to identify any Millennium employee that Roberts had solicited to join HealthTrackRx. (R. 39, tr., at 80 [PageID #: 408].)

The court finds, therefore, that Millennium has not shown a substantial likelihood of success on its breach of contract claims regarding the Non-Disclosure, Non-Solicitation of Customers, and Non-Solicitation of Employees provisions of the Agreement. *See, e.g., Transtar Indus., LLC v. Lester*, No. 1:19CV1230, 2019 WL 3458456, at *7 (N.D. Ohio July 31, 2019) (plaintiff failed to demonstrate defendants improperly used confidential information); *Fifth Third Processing, Solutions, LLC, v. Elliott*, No. 1:11CV247, 2011 WL 4946330, at *4-*5 (S.D. Ohio Oct. 18, 2011) (plaintiff failed to produce evidence of breach of non-solicitation or disclosure clauses). The Non-Competition provisions require further analysis, however.

The Non-Competition provisions of the Agreement prohibit Roberts, for a period of one year, from "directly or indirectly, provid[ing] services that are the same or similar in function or

27

purpose to the services [Roberts] provide[d] to [Millennium] during the last two years of

employment [in any capacity] to any business that is competitive with any aspect of

[Millennium]'s business as to which [Roberts] had material-business related involvement or

about which [Roberts] received Confidential Information during [that same period]."  (R. 44-4,

JX 2, § 3.b.ii.)  According to the Agreement, "[a] business shall be considered 'competitive' if its

products or services would compete with or displace the products and/or services that

[Millennium] was engaged in providing or developing at the time [Roberts]'s employment with

the Company ended."  *Id.*

    The fundamental issue is whether the services that Roberts now provides to

HealthTrackRx/AIT as CEO are "the same or similar in function or purpose" to the services that

Roberts provided to Millennium as a Regional Sales Director.  Millennium points to factors that

HealthTrackRx considered in its CEO search, but Millennium did not provide any direct

evidence regarding Roberts' current job description or actual day-to-day responsibilities as CEO

of HealthTrackRx/AIT, other than Roberts' testimony at the hearing.[4]

    Roberts testified that his duties as CEO include helping create business plans and

strategies, as well as overseeing the company and each of its various departments.  As CEO,

Roberts reports directly to the board of directors, and one of his goals is to grow the company by

---

[4] Roberts' October 8, 2019, Employment Agreement with HealthTrackRx, which has been
produced, primarily addresses other matters.  *See generally* R. 44-4, PX 11, PageID #: 2026-
2039.  The "Position and Duties" section simply provides that Roberts will "render such
administrative, financial and other executive and managerial services to the Company and have
the responsibilities and authority which are consistent with the Executive's position," subject to
the authority of the board of directors.  *Id.* at 2026.

increasing HealthTrackRx's market share.  The record indicates the companies do not compete in many business areas and there is insufficient evidence that Robert's above-goal would require him and HealthTrackRx to compete directly with Millennium, in violation on the Agreement, for its existing and prospective customers.  *See* Section II.A. ¶¶ 1-5.

Although Roberts' role as a Regional Sales Director for Millennium, and his role as CEO for HealthTrackRx, have some parallel responsibilities in terms of driving revenue growth for each organization, Roberts' role at Millennium was two corporate levels below the CEO and he primarily implemented strategic goals or initiatives that were created by the executive group. His role at Millennium had changed recently, such that he was no longer allowed the autonomy he had once had, for example, in terms of hiring.  As CEO at HealthTrackRx, Roberts oversees strategic plans for every department and makes executive decisions for the overall company. Roberts informed Millennium's sales team of his restrictive covenants and his intention to adhere to them.  Roberts stated that he could not be involved in any sales meetings, and that he was not customer-facing, because he was now the CEO of the company.  His Employment Agreement with HealthTrackRx provides that Roberts will render administrative, financial and other executive and managerial services, and have the responsibilities and authority consistent with his position as Chief Executive Officer.  *See generally* R. 44-4, PX 11, PageID #: 2026.  As Regional Sales Manager at Millennium, Roberts' responsibilities, while broad, were much more limited.

The positions are qualitatively different in function and overall purpose.  *See, e.g., Avery Dennison*, 924 F.Supp.2d at 900-901.  The court finds that, without more, Millennium has not shown by clear and convincing evidence that the services that Roberts provides to

29

HealthTrackRx/AIT as CEO are "the same or similar in function or purpose" to the services that Roberts provided to Millennium when he was Regional Sales Director.

Further, Millennium has not shown a substantial likelihood of success on its assertion that Roberts' mere employment in Texas breaches the Non-Competition provisions of the Agreement.  As Millennium's Regional Sales Director for the Central Region of the United States, Roberts was responsible for an area encompassing seventeen states, which did not include Texas.  *See, e.g.*, R. 44, PageID #: 1234-1235.  Millennium, nonetheless, argues for an expansive reading of the Agreement's non-competition "Restricted Area," contending that "the non-compete has nationwide applicability due to the nature of the expansive services Roberts performed for Millennium over the last two years."  (R. 44, PageID #: 1234.)  The relevant provision states:

> For a period of one year following Employee's termination of employment with Employer . . . Employee shall not, directly or indirectly, provide services that are the same or similar in function or purpose to the services Employee provides to the Employer during the last two years of employment . . . to any business that is competitive with any aspect of Employer's business as to which Employee had material-business related involvement or about which Employee received Confidential Information during the last two years of employment <u>in any state, province, or other jurisdiction in which Employee performed services or otherwise assisted the Employer in doing business or preparing to do business</u> during the last two years of employment (the "Restricted Area").

Agreement, at § 3.b.ii. (emphasis added).  Defendants argue that Millennium has failed to meet its burden of showing that Texas, where Roberts is now employed as CEO, is within the Restricted Area as defined in the Agreement.  (R. 42, PageID #: 1035; *see also* R. 43, PageID #: 1044.)

Although Millennium concedes that Roberts' Regional Sales Director territory did not include Texas, *see, e.g.*, R. 44, PageID #: 1234-1235, it asserts that several contacts Roberts had

in Texas, along with his exposure to nationwide strategies and customers should lead to a nationwide geographic restriction.  *Id.* at 1235.  Millennium argues that "he traveled to Dallas, Texas for national sales meetings, traveled to Austin, Texas for a site visit of a potential blood lab partner, and also worked with customers that had operations beyond his Central Region, including a new Millennium customer that has five locations in Texas."  *Id.*  But without a more extensive factual showing—detailing, for example, Roberts' actual involvement with Millennium customers in Texas and elsewhere outside the Central Region—the minimal contacts Plaintiff identified are insufficient to support applying the "Restricted Area" nationwide.

Millennium also asserts that nationwide non-compete agreements involving multi-state industries have been found reasonable under Ohio law, relying on two cases.  (R. 44, PageID #: 1234.)  But Millennium relies on factually distinguishable case law and its argument is unpersuasive.  In *Try Hours, Inc. v. Douville*, the court noted that "the expedited freight industry is a fiercely competitive, niche industry" and "the nationwide scope of the covenant not to compete is particularly necessary in light of the fact that the trucking industry is a multistate industry."  985 N.E.2d 955, 966 (Ohio Ct. App. 2013).  Given that the nature of the trucking industry forced plaintiff to compete with trucking firms across the country, the court concluded that the nationwide covenant not to compete was reasonable.  *Id.*  In that case, however, and unlike here, the parties agreed to a covenant not to compete that expressly defined the geographic area to include "the continental United States."  *Id.* at 958.  In addition, the pertinent facts supported a legitimate business interest in enforcing that geographic scope; the plaintiff did not seek to enforce it over a wider area than the agreement specified.  *Id.* at 958.

The *First Energy* case is even less persuasive.  In *FirstEnergy Sols. Corp. v. Flerick*, the court noted that the non-compete did not restrict defendant from selling electricity in the forty-four states where plaintiff did not operate.  521 Fed. App'x 521, 527 (6th Cir. 2013).  The court found that the covenant only restricted defendant from directly competing with plaintiff in a specific region (six states) for a short period of time.  *Id.*  That is not the situation before this court, where plaintiff argues for an expansive 50-state application of the Restricted Area, rather than the Ohio where Roberts was based or the specific seventeen state territory in the Central Region he oversaw as the Regional Sales Director.

The court finds that Millennium has not carried its burden to establish by clear and convincing evidence that the "Restricted Area" provision of the Agreement should have the broad, nationwide, application urged.  Without more than the minimal contacts with Texas and elsewhere outside the Central Region that Plaintiff has identified, the court does not find that the Agreement unambiguously prohibits Roberts' employment in such a broad geographic area.  Rather, the court finds that applying the "Restricted Area" to bar Roberts from working for HealthTrackRx/AIT in Denton, Texas, on the present record, is likely an unreasonable and unenforceable interpretation of the Agreement.

Consequently, the court finds that Millennium has not shown a substantial likelihood of success on its breach of contract claims regarding the Non-Competition provisions of the Agreement.

### b.  Misappropriation of Trade Secrets

The third and fourth counts of the complaint allege misappropriation of trade secrets, in violation of state and federal law, against all defendants.  (R. 1, PageID #: 26-31, 32-37.)

Millennium first alleges misappropriation of trade secrets under Ohio Rev. Code § 1333.61, *et seq.*  Under Ohio law, in order to prevail on a misappropriation of trade secrets claim, Millennium must prove:  "(1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret." *Transtar Indus.*, 2019 WL 3458456, at *1; *see also Duro Corp. v. Canadian Standards Ass'n*, No. 1:17CV1127, 2017 WL 6326862, at *2 (N.D. Ohio Dec. 11, 2017).

If Millennium proves the existence of a trade secret, it still carries the burden of demonstrating that misappropriation has occurred or is threatened; simply stating that inappropriate use of the information is inevitable is not sufficient.  *Premier Dealer Serv., Inc. v. Allegiance Admin'rs, LLC*, No. 2:18CV735, 2018 WL 5801283, at *5 (S.D. Ohio Nov. 6, 2018); *Prosonic Corp. v. Stafford*, 539 F. Supp. 2d 999, 1005 (S.D. Ohio 2008) (citing *Extracorporeal Alliance, L.L.C. v. Rosteck*, 285 F.Supp.2d 1028, 1042-1043 (N.D. Ohio 2003), *aff'd*, 113 Fed. Appx. 98 (6th Cir. 2004)).  Ohio law requires proof by clear and convincing evidence to justify relief in trade secrets cases under O.R.C. § 1333.62.  *Prosonic*, 539 F. Supp. 2d at 1005 (citing *Procter & Gamble*, 140 Ohio App.3d at 268, 747 N.E.2d 268).

The federal claim alleges misappropriation of trade secrets in violation of the Defend Trade Secrets Act (DTSA), 18 U.S.C. §§ 1836, 1839.  To state a federal DTSA claim for injunctive relief, Millennium is required to show: "(1) the existence of a protectable trade secret; and (2) misappropriation of the trade secret by defendant." *PPS Serv. Grp., LLC v. Eckert*, No. 1:18CV727, 2019 WL 3927232, at *3 (S.D. Ohio Aug. 20, 2019).  A "trade secret" under the federal DTSA has two elements:  "(1) the owner thereof has taken reasonable measures to keep such information secret; and (2) the information derives independent economic value, actual or

potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." *C-Ville Fabricating, Inc. v. Tarter*, No. 5:18CV379, 2019 WL 1368621, at *12 (E.D. Ky. Mar. 26, 2019) (citing 18 U.S.C. § 1839(3)).

> Misappropriation is shown by:
>
> . . . facts establishing an unconsented disclosure or use of a trade secret by one who used improper means to acquire the secret; or, at the time of the disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret.

*Ford Motor Co. v. Launch Tech Co.*, No. 17-12906, 2018 WL 1089276, at *16 (E.D. Mich. Feb. 26, 2018) (citing 18 U.S.C. § 1839(5)); *see also C-Ville Fabricating*, 2019 WL 1368621, at *12 (quoting *Ford Motor*).

Millennium has made a sufficient showing, at this stage, to satisfy the first element of both the Ohio and federal trade secret claims—the existence of a protectable trade secret. Roberts had knowledge of Millennium's confidential and trade secret information, such as, Millennium's customer lists, locations, preferences and practices, profitability, order history, and strategies for serving and marketing to certain existing and potential customers; Millennium's business plans and strategies; Millennium's sales and marketing techniques, and strategies; and Millennium's strategic goals and forecasts.  Although some of these categories may not prove protectable trade secrets following discovery, the court also finds that Millennium has taken reasonable measures to protect such information from unauthorized disclosure.  *See* Section II.A, *supra*.  In addition, Millennium has demonstrated that Roberts acquired his knowledge of its

confidential and trade secret information through his employment as Regional Sales Director. *Id.*

But Millennium still carries the burden of demonstrating that misappropriation has occurred or is threatened. *Premier Dealer Serv.*, 2018 WL 5801283, at *5; *Prosonic Corp.*, 539 F. Supp. 2d at 1005. An Ohio claim of actual misappropriation requires proof of "the unauthorized use of a trade secret." *Transtar Indus*, 2019 WL 3458456, at *1; *see also Duro Corp*, 2017 WL 6326862, at *2. Similarly, the federal claim requires proof of an "unconsented disclosure or use of a trade secret." *Ford Motor*, 2018 WL 1089276, at *16 (citing 18 U.S.C. § 1839(5)); *see also C-Ville Fabricating*, 2019 WL 1368621, at *12. Millennium has presented no evidence that defendants have committed an "unauthorized use of a trade secret," or "disclosure or use of a trade secret." The record indicates that Roberts returned his Millennium-issued devices; he stated in writing that he returned all proprietary and confidential information and that "he doesn't have anything in his possession[;]" and that Millennium produced no evidence that Roberts has maintained any Millennium information believed to be confidential or trade secret. (R. 39, tr., at 125-26 [PageID #: 453-54].) In addition, Millennium's Senior VP of Sales, Gunhouse, testified that she could not identify any confidential information or trade secret that Roberts had disclosed to HealthTrackRx. (R. 39, tr., at 79 [PageID #: 407].)

Nonetheless, "Ohio law provides that actual or threatened misappropriation trade secrets may be enjoined. O.R.C. 1333.62(A)." *Extracorporeal Alliance, L.L.C. v. Rosteck*, 285 F. Supp. 2d 1028, 1042 (N.D. Ohio 2003). As such, Millennium argues that it does not have to prove that defendants have actually used Millennium's trade secrets to prevail on a threatened misappropriation claim. (R. 44, PageID #: 1251.) Millennium asserts that "Roberts' deep

35

knowledge base of Millennium's regional and national sales initiatives and business plans (which he helped write) makes his use, disclosure, and/or reliance on such trade secrets inevitable." *Id.*

Our court has summarized the inevitable disclosure doctrine relied upon by plaintiff as follows:

> The inevitable disclosure doctrine holds that a threat of irreparable harm "can be shown by facts establishing that an employee with detailed and comprehensive knowledge of an employer's trade secrets and confidential information has begun employment with a competitor of the former employer in a position that is substantially similar to the position held during the former employment."

*Invacare Corp.*, 2018 WL 2454523, at *6 (quoting *Procter & Gamble*, 140 Ohio App.3d at 274, 747 N.E.2d at 279); *see also PolyOne*, 67 F.Supp.3d at 873; *Avery Dennison*, 924 F.Supp.2d at 900.  However, the movant must present evidence to support its inevitable disclosure argument, because "simply stating that inappropriate use of the information is inevitable is not sufficient." *Unique Paving Materials Corp. v. Fargnoli*, No. 07CV2501, 2008 WL 11383295, at *5 (N.D. Ohio Oct. 31, 2008), *aff'd*, 361 Fed. Appx 689 (6th Cir. 2010) (quoting *Prosonic*, 539 F. Supp. 2d at 1005; citing *Extracorporeal Alliance*, 285 F. Supp. 2d at 1042 (denying injunction in part because there was no evidence that former employee threatened to disclose trade secrets)).

The inevitable disclosure doctrine does not support a finding that Roberts will inevitably violate the trade secret statutes at issue.  While the court has already determined that Roberts had some knowledge of Millennium's trade secrets and confidential information, Millennium has not shown that an actual or threatened misappropriation of trade secrets has occurred.  There is no evidence that Roberts has already used or is likely to use confidential information and trade secrets to compete with Millennium, to solicit Millennium customers, or to implement HealthTrackRx sales strategies or marketing initiatives in a manner that relied upon

36

misappropriated Millennium information.  Rather, the evidence thus far shows at best, a threat of misappropriation that is speculative, not reasonably likely to occur.

Further, Millennium has not shown by clear and convincing evidence that the services Roberts provides to HealthTrackRx/AIT as CEO are "substantially similar" to the services that Roberts provided to Millennium when he was Regional Sales Director, as explained above. Thus, the court does not infer that Roberts will inevitably breach the Agreement in his new position.  *See, e.g.*, *PolyOne*, 67 F.Supp.3d at 873; *Avery Dennison*, 924 F.Supp.2d at 900-901. The court, therefore, finds that Millennium has not shown a substantial likelihood of success on its state or federal misappropriation of trade secrets claims based on the inevitable disclosure doctrine.

### c.  Tortious Interference

The fifth count alleges HealthTrackRx and AIT tortiously interfered with Millennium's Agreement with Roberts by inducing him to breach his contract by disclosing confidential information and joining a competitive business.  (R. 1, PageID #: 38-39.)  To prevail on such a claim, Millennium must prove: "(1) the existence of a contractual relationship; (2) [defendants'] knowledge of the contract; (3) [defendants'] intentional procurement of the contract's breach; (4) lack of justification; and (5) resulting damages."  *AK Steel*, 2014 WL 11881029, at *16 (citing *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St.3d 171, 176, 707 N.E.2d 853 (1999)); *see also Marin v. Cleveland Clinic*, No. 1:09CV2090, 2010 WL 359699, at *4 (N.D. Ohio Jan. 29, 2010); *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 650 N.E.2d 863, 864 (1995) (syllabus).

37

The fourth element of the tort (lack of justification) requires proof that the defendant's interference with the contract was improper. *Fred Siegel*, 85 Ohio St. 3d at 176, 707 N.E.2d at 858. The issue is whether the alleged wrongdoer's actions were improper, or privileged. *Office Depot, Inc. v. Impact Office Prod., LLC*, 821 F. Supp. 2d 912, 924 (N.D. Ohio 2011) (citing *Fred Siegel*). "Ohio law places the burden of proving 'lack of privilege' or 'improper justification' on the plaintiff." *Melohn Companies, Inc. v. AmeriFirst Fin. Corp.*, No. 1:17CV1303, 2018 WL 1991720, at *5 (N.D. Ohio Apr. 26, 2018) (citing *Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 742 (6th Cir. 1999)).

Millennium has established the existence of the first and second elements—a contractual relationship and defendants' knowledge of the same. However, the Agreement states that Roberts was an at-will employee, "which means that either Company or Employee may terminate Employee's employment at any time, with or without notice and with or without cause." (R. 44-4, JX 2-3, Agreement ¶ 1.) In Ohio, "[i]f an employee is at-will, tortious interference with contract is not a viable cause of action." *Mitchell v. Mid-Ohio Emergency Servs., LLC*, No. 03AP-981, 2004 WL 2803419, at *9 (Ohio Ct. App. Sept. 30, 2004) (citing *Emergency Preemption, Inc. v. Emergency Preemption Sys., Inc.*, No. 71350, 1997 WL 473093, at *5 (Ohio Ct. App. Aug. 14, 1997)); *see also Sheffield Metals Cleveland, LLC v. Kevwitch*, No. 1:17cv1120, 2018 WL 1290990, *11 (N.D. Ohio Mar. 13, 2018) (same); *Hoyt, Inc. v. Gordon & Assocs., Inc.*, 104 Ohio App.3d 598 (Ohio Ct. App. 1995)); *Miller Bros. Excavating v. Stone Excavating, Inc.*, No. 97-CA-69, 1998 WL 12646, at *9 (Ohio Ct. App. Jan. 16, 1998); *see generally Marlite, Inc. v. Canas*, No. 5:09CV1401, 2009 WL 7272686, at *8 (N.D. Ohio July 22, 2009) (fair competition is privileged and will defeat a claim of tortious interference with an at-

38

will employment contract, citing *Fred Siegel Co.*, 85 Ohio St.3d 171, 707 N.E.2d 853); *Prosonic*, 539 F. Supp. 2d at 1006 (same).

Further, as noted above, Plaintiff has not made a sufficient showing of breach of contract or misappropriation of trade secrets to rely upon either as a basis to persuasively argue that HealthTrackRx/AIT tortiously interfered with Roberts agreement with Millennium.  The court finds that Millennium has not shown by clear and convincing evidence a substantial likelihood of success on its tortious interference with contractual relations claim.

### 2.  Irreparable Harm

The second consideration before a preliminary injunction can be issued is whether the movant has shown irreparable injury without the injunction.  *BNSF Ry.*, 800 F.3d at 268; *City of Pontiac Retired Employees*, 751 F.3d at 430; *Invacare Corp.*, 2018 WL 2454523, at *3; *Procter & Gamble*, 140 Ohio App.3d at 267, 747 N.E.2d at 273.  The movant must always demonstrate irreparable harm before an  injunction will issue.  *Friendship Materials*, 679 F.2d at 104; *Basicomputer Corp.*, 791 F.Supp. at 1285.  A plaintiff's harm is generally not "irreparable" if it is fully compensable by money damages.  *Overstreet*, 305 F.3d at 578 (citing *Basicomputer Corp.*, 973 F.2d at 511); *Honeywell*, 1998 WL 152951, at *3.  The court, however, has discretion to:

> . . . grant a preliminary injunction even where the plaintiff fails to show a strong or substantial probability of ultimate success on the merits of his claim, but where he at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction is issued.

*Friendship Materials*, 679 F.2d at 105.  *Accord Six Clinics Holding Corp., II v. Cafcomp Systems, Inc.*, 119 F.3d 393, 400 (6th Cir. 1997); *In re Eagle-Picher Industries, Inc.*, 963 F.2d 855, 860 (6th Cir. 1992).

39

Millennium contends that it will suffer irreparable harm as a result of the defendants'
acts.  (R. 44, PageID #: 1256-1259.)  As discussed above, however, Millennium has not
identified any actual or threatened harm, such as lost customers, accounts, sales or goodwill due
to defendant's wrongdoing.  At the hearing, for example, Millennium's Senior VP of Sales,
Gunhouse, could not identify any confidential information or trade secret that Roberts had
disclosed to HealthTrackRx, (R. 39, tr., at 79 [PageID #: 407]); nor a single Millennium
customer that had been lost to or even solicited by Roberts or HealthTrackRx (R. 39, tr., at 73,
79-80 [PageID #: 401, 407-408].)  *See, e.g.*, *Unique Paving*, 2007 WL 2902909, at *4 (no
evidence that defendant had disclosed trade secrets).

Millennium asserts that Ohio courts presume a threat of irreparable harm exists if an
employee with knowledge of the former employer's trade secrets "begins working in a position
that causes [him] to compete directly with the former employer or the product line that the
employee formerly supported."  (R. 44, PageID #: 1256) (quoting *Jacono v. Invacare Corp.*, No.
86605, 2006 WL 832451, at *7 (Ohio Ct. App. Mar. 30, 2006).)  The court in *Jacono* compared
the situation before it with the inevitable disclosure rule, but found that plaintiff failed to show
actual or threatened harm to support irreparable injury.  *Jacono*, 2006 WL 832451, at *7.  The
court also noted that "any harm or threat of harm is not irreparable if money damages can serve
as an adequate remedy."  *Id. See also Kyrkos v. Superior Beverage Grp., Ltd.*, No. 99444, 2013
WL 5676256, at *3 (Ohio Ct. App. Oct. 17, 2013) (same, citing *Jacono*).

That is not to suggest that Plaintiff may never sustain irreparable injury, as "the Sixth
Circuit has stated that the 'loss of fair competition that results from the breach of a non-
competition covenant is likely to irreparably harm an employer.'"  *Extracorporeal Alliance*, 285

F.Supp.2d at 1044-1045 (quoting *Basicomputer*, 973 F.2d at 512); *see also Invacare Corp.*, 2018 WL 2454523, at *6-8.  Once again, the *Invacare Corp*. case is instructive.  There, the court granted injunctive relief after finding potential for irreparable injury—absent evidence of actual harm, loss of business or goodwill—because, *inter alia*, plaintiff showed the inevitable disclosure doctrine applied and presented substantial evidence that defendant was contacting customers and unfairly competing against the former employer in violation of the non-competition agreement.  *Id.*  Millennium, however, has not presented evidence to support a similar finding.

Moreover, the court in *Extracorporeal Alliance* aptly reasoned that "given the precision with which damages can be measured in this case, . . . no such inference [of irreparable injury] should be made in this case." 285 F.Supp.2d at 1045.  The court finds the same situation to exist here, precluding such an inference of irreparable injury.  Millennium has not shown that any future injury—if Millennium can prove that it lost contracts, sales, or business due to the defendants' wrongdoing—could not be compensated by monetary damages.  *See, e.g.*, *id.* (citing *Basicomputer*, 973 F.2d at 511 (harm is not irreparable if it is fully compensable by monetary damages)); *see also Kyrkos*, 2013 WL 5676256, at *3; *Jacono*, 2006 WL 832451, at *7.  These damages may be readily calculable based on the value of the various accounts.  *See, e.g.*, *Kyrkos*, 2013 WL 5676256, at *3 ("any lost profits suffered by Superior could be measured through appropriate valuation mechanisms"); *Marlite*, 2009 WL 7272686, at *10 (as a result of defendant's competing activities on behalf of new employer, plaintiff had been forced to lower its prices significantly).

41

The court finds that Millennium has not proven by clear and convincing evidence that it has or will suffer irreparable injury without the injunction.

### 3. Undue Hardship and Public Interest

The final two elements, whether the preliminary injunction would substantially harm third parties and whether the public interest would be served by issuing the preliminary injunction, *BNSF Ry.*, 800 F.3d at 268; *City of Pontiac Retired Employees*, 751 F.3d at 430; *Invacare Corp.*, 2018 WL 2454523, at *3; *Procter & Gamble*, 140 Ohio App.3d at 267, 747 N.E.2d at 273, have already been discussed, in part, in the context of the reasonableness of the Agreement.  The court finds that these two factors do not weigh heavily in this case.  The preliminary injunction would not substantially harm third parties; should the injunction issue, the public would not be deprived of the benefits of toxicology testing by either company.  The public interest in preventing unfair competition and upholding valid contracts between employers and employees would be served by the issuance of the injunction.  On the other hand, restrictive employment covenants may stifle competition.  On balance, the court finds that the public interest element is neutral.

### III.     SUMMARY AND RECOMMENDATION

A preliminary injunction is an extraordinary and drastic remedy and is only granted if the movant carries its burden of showing by clear and convincing evidence that such extraordinary relief is warranted.  *S.Glazer's Distributors*, 860 F.3d at 849; *Transtar Indus.*, 2019 WL 3458456, at *8  (citing *Overstreet*, 305 F.3d at 573.)  After weighing all four factors, the court concludes Millennium has not established by clear and convincing evidence that preliminary injunctive relief is warranted.

In view of the foregoing, it is respectfully RECOMMENDED that the motion for a preliminary injunction (R. 1, PageID #: 39-41) be DENIED.


Dated:   March 4, 2020            /s/ David A. Ruiz
                                 David A. Ruiz
                                 United States Magistrate Judge



OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of service of this notice.  Fed. R. Civ. P. 72(a); LR 72.3(a). Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *see also United States v. Walter*s, 638 F.2d 947 (6th Cir. 1981).

43